442 F.2d 178
 Martin SOSTRE, Plaintiff-Appellee,
v.
Paul D. McGINNIS, Commissioner of Correction of the State of
New York, VincentMancusi, Warden of Attica Prison,
and Harold W. Follette, Warden of Green
HavenPrison, Defendants-Appellants.
 No. 180, Docket 35038.
 United States Court of Appeals, Second Circuit.
 Argued to the court in banc Oct. 21, 1970.
Decided Feb. 24, 1971.
 
 Kristin Booth Glen, New York City (Victor Rabinowitz, David Rosenberg, Rabinowitz, Boudin & Standard, New York City, of counsel), for appellee.
 Hillel Hoffman, Asst. Atty. Gen., of N.Y. (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., and Mark T. Walsh, Asst. Atty. Gen., on the brief), for appellant.
 William Bennett Turner, San Francisco, Cal. (Jack Greenberg, Stanley A. Bass, New York City, on the brief), amicus curiae, for the N.A.A.C.P. Legal Defense and Educational Fund, Inc., and the National Office for the Rights of the Indigent.
 Haywood Burns, Lowell Johnston, Margaret Burnham, New York City, on the brief, amicus curiae, for The National Conference of Black Lawyers.
 Before LUMBARD, Chief Judge, WATERMAN, Senior Circuit Judge,* and MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 We voted to hear the initial argument of this appeal en banc, a procedure we reserve for extraordinary circumstances, so that we might give plenary review to a complex of urgent social and political conflicts persistently seeking solution in the courts as legal problems, a phenomenon de Tocqueville commented upon many years ago. Democracy in America, vol. I at 290 (Vintage ed. 1945). The elaborate opinion and order below raise important questions concerning the federal constitutional rights of state prisoners which neither Supreme Court precedent nor our own past decisions have answered. The sparse authority from other courts is for the most part either inconclusive or conflicting.
 
 I.
 PROCEEDINGS BELOW AND JURISDICTION
 
 2
 This is an appeal from an order entered May 14, 1970, by Judge Motley, sitting in the Southern District of New York, 312 F.Supp. 863, which granted plaintiff Martin Sostre punitive and compensatory damages against defendants Follette and McGinnis as well as a wide variety of injunctive relief in his action pursuant to the Civil Rights Act of 1871, 42 U.S.C. 1983, and 28 U.S.C. 1331, 1343(3). At the time Sostre filed his handwritten complaint, he was incarcerated in New York's Green Haven Prison (now called Green Haven Correctional Facility), serving a sentence of thirty to forty years for selling narcotics, followed by thirty days further imprisonment for contempt of court, imposed on him March 18, 1968. The original defendants included the Governor of New York as well as the State Commissioner of Correction, appellant McGinnis; the Warden of Green Haven, Harold W. Follette, who died shortly before the opinion below was entered;[1] and the Warden of Attica Prison (now called Attica Correctional Facility), appellant Vincent Mancusi. Sostre had been confined for one night in Attica immediately after sentencing, them transferred the following day to Green Haven.
 
 
 3
 Sostre does not appeal from the dismissal by the district court of his action against the Governor, in which Sostre had asserted the Governor's complicity in racial discrimination in the administration of New York's prison system.
 
 
 4
 Because there was no finding below that Warden Mancusi had in any way violated Sostre's constitutional rights, the case against him should also have been dismissed. In refusing this dismissal, Judge Motley observed that Commissioner McGinnis 'has the power to re-transfer Sostre to Attica.' 312 F.Supp. at 877 n. 8. The relevance of this admitted fact escapes us. After bringing this law suit, Sostre was transferred to Wallkill State Prison, but we suppose that would not justify an injunction directed against the Warden there.
 
 
 5
 We agree with the district court that Sostre was not required as a precondition of maintaining this suit to perform the meaningless and plainly futile gesture of writing a letter to defendant McGinnis. See Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (per curiam); Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969). The record amply supports the district court's finding that the State Commissioner of Correction 'had already been informed of the facts' and further enlightenment from Sostre himself could not have been expected to affect his attitude or his inaction.[2] 312 F.Supp. at 881-882. Nor is exhaustion of state legal or equitable remedies necessary to a Section 1983 action, which provides 'a remedy in the federal courts supplementary to any remedy any State might have.' McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622 (1963). See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) (per curiam); Wright v. McMann, 387 F.2d 519, 522-523 (1967).
 
 
 6
 Moreover, because Sostre 'is not challenging the validity of his sentence with the ultimate object of obtaining release' from prison, Hancock v. Avery, 301 F.Supp. 786, 791 (M.D.Tenn.1969), his Section 1983 petition is clearly not a mere sham procedure to avoid the exhaustion requirement of the federal habeas corpus statute, 28 U.S.C. 2254(b), (c). Cf. Smartt v. Avery, 411 F.2d 408 (6th Cir. 1967); Kalec v. Adamowski, 406 F.2d 536 (7th Cir. 1969); Peinado v. Adult Auth., 405 F.2d 1185, 1186 (9th Cir.), cert. denied, 395 U.S. 968, 89 S.Ct. 2116, 23 L.Ed.2d 755 (1969); Johnson v. Walker, 317 F.2d 418, 419-420 (5th Cir. 1963); King v. McGinnis, 289 F.Supp. 466 (S.D.N.Y.1968).
 
 II.
 FACTS
 
 7
 A. Circumstances of Sostre's Commitment to Punitive Segregation
 
 
 8
 On June 25, 1968, Warden Follette ordered that Sostre be committed pursuant to Section 140 of the New York Correction Law, McKinney's Consol. Laws, c. 43,[3] to 'solitary confinement' (the words in the statute) or 'punitive segregation' (the term adopted by Judge Motley and by the parties on appeal, which we will use for that reason and also because he was not as isolated in his segregation as 'solitary' would imply). The parties vigorously disagree as to the considerations that motivated Follette to inflict this punishment.
 
 
 9
 On June 25, 1968, the day he put Sostre in segregation, Follette called Sostre to his office. At this meeting, Follette questioned Sostre about his attempt that morning to mail to an attorney, Miss Joan Franklin of the National Association for the Advancement of Colored People, a letter with handwritten legal papers attached, including a motion for use in the trial of Mrs. Geraldine Robinson. Mrs. Robinson is described by Judge Motley and the parties on appeal as Sostre's 'codefendant.' Although she was joined with Sostre in the indictment which resulted in Sostre's imprisonment, they were not tried together. Follette told Sostre 'he must confine his legal activities to his own incarceration' and accordingly that the motion would not be mailed. Follette explained that he objected to Sostre's attempt to 'practice law' without a license. Sostre believed that he had a right to mail legal papers in behalf of Mrs. Robinson and refused to assure Follette, as Follette requested, that he would discontinue attempting to mail such documents through normal prison channels.
 
 
 10
 During the same interview, Follette questioned Sostre about a reference to an organization known as 'R.N.A.,' mentioned by Sostre in his letter to Miss Franklin and to which Sostre had referred in earlier correspondence. 'R.N.A.' in fact referred to the Republic of New Africa, which Sostre identified at the trial before Judge Motley as a black liberation or black separatist organization. Sostre disputed Follettee's tstimony that Sostre had lied about R.N.A. at the June 25 interview by persistently claiming at that time that it was a 'federal agency * * * 'Recovery National Administration' or something like this.' Sostre did admit, as Follette asserted at trial, that after responding to a few questions Sostre refused to discuss R.N.A. further. The plaintiff's justification for his silence was that Follette had persisted in labelling R.N.A. a 'subversive organization.' Sostre 'clammed up,' as he testified, to avoid antagonizing Follette by further explaining or defending R.N.A.
 
 
 11
 Follette testified without contradiction that the organization known as the Republic of New Africa was of sufficient concern to him to have been the object of an investigation before the interview with Sostre. Follette feared that 'this organization was a cloak for an attempt to organize prison inmates for riot and insurrection,' based on information obtained from the F.B.I. and the New York State and Buffalo City Police. 'The possibility of insurrection at Green Haven' was a 'major fear' to Follette at all times, but particularly so in June, 1968. Security at the prison had been weakened, in Follette's view, by an exceptionally high turnover of correction officers, approaching a rate of about fifty percent each year. An influx of new officers had not yet been cleared through the New York State Identification and Intelligence System. Moreover, Sostre had exacerbated Follette's concern with the possibility of major disorder because of a statement in a letter that Sostre had written to his sister, dated May 19, 1968:
 
 
 12
 As for me, there is no doubt in my mind whatsoever that I will be out soon, either by having my appeal reversed in the courts or by being liberated by the Universal Forces of Liberation.
 
 
 13
 This sentence is included in a broad indictment of militarism and oppression in this country and a prediction that 'the power structure' would soon be overthrown.
 
 
 14
 Follette insists that his decision to commit Sostre to segregation reflected (1) Sostre's declared intent to defy Follette's order by preparing legal papers for his co-defendant; (2) his intransigence about R.N.A.; (3) the allusion in the letter to his sister to his impending liberation. Rule 54 of the 'Inmate's Rule Book,' a publication of the New York Department of Correction issued to each prisoner when he arrives at Green Haven, limits inmate correspondence to 'their own personal matters.' Follette interpreted this as proscribing the sending of legal papers in behalf of a co-defendant. Sostre's refusal to discuss R.N.A. and his persistence about Mrs. Robinson's legal papers both violated Rule 5 of the Inmate Rule Book which requires that an inmate obey orders 'promptly and fully,' pending whatever appeal he may wish to take to higher authority. In addition, his silence violated Rule 12, enjoining inmates to answer 'fully and truthfully' all questions put by prison officials. In sum, Follette assigned as his motive for Sostre's punishment the fact that Sostre's 'whole attitude was one of defiance, of flatly refusing * * * to conduct himself as a proper inmate within the rules, regulations and laws set down by the State of New York and the Department of Correction.' Section 140 of the New York Correction Law authorized Follette, by its terms in his unfettered discretion, to commit Sostre to segregation when 'necessary * * * to produce (his) entire submission and obedience' and to keep him there 'until he shall be reduced to submission and obedience.'
 
 
 15
 Judge Motley disbelieved each of Follette's asserted motives for punishing Sostre, crediting instead Sostre's testimony that Follette was motivated by Sostre's threat to sue Follette over his withholding the motion papers intended for Mrs. Robinson. Additionally, Judge Motley attributed to Follette an intent to punish Sostre because of his earlier activism in bringing litigation related to the practice of the Black Muslim religion in New York prisons and 'because he is, unquestionably, a black militant who persists in writing and expressing his militant and radical ideas in prison.' Judge Motley held that the summary meeting with Warden Follette which resulted in Sostre's commitment to segregation did not afford due process of law to Sostre before his 'liberty' was taken.
 
 
 16
 Apart from the events of the June 25 interview, Judge Motley also dismissed as one of Follette's reasons for continuing Sostre's incarceration in segregated confinement several items of 'contraband' which Follette claimed were the fruit of a search of Sostre's cell conducted immediately after he entered segregation. These items consisted of (1) two small (3 inches by 5 inches) pieces of heavy black emery paper covered with an abrasive material like sand which, according to Follette, could be flaked off and in some manner attached to a string to fashion an instrument capable of sawing through cell bars; (2) six tables of contents torn from issues of the Harvard Law Review and stamped by prison officials to indicate that the books, Sostre's personal property, were not to circulate to other prisoners; (3) a letter dated June 10, 1968, from the Appellate Division of the Supreme Court of New York addressed to a fellow-prisoner of Sostre's, Juan Moline, a Puerto Rican, which Sostre later explained he was translating for Moline from English into Spanish. Judge Motley believed Sostre's testimony that he had never seen the pieces of emery paper before they were introduced by defendants at trial. 312 F.Supp. at 869. The other contraband indicated that Sostre had violated prison rules by circulating his law periodicals to other prisoners and by giving a fellow-prisoner legal assistance without first securing the Warden's permission. The Court below not only declined to find that these activities motivated the punishment of Sostre, but held in addition, that Sostre's activities were protected by the Fourteenth Amendment.[4]
 
 B. Conditions of Punitive Segregation
 
 17
 Sostre remained confined in punitive segregation for twelve months and eight days, until Judge Motley restrained his continued punishment pendente lite on July 2, 1969. By regulation, Sostre lost the opportunity to earn 124 1/3 days of good behavior credit while he was segregated.[5] We cannot avoid setting forth the precise conditions of Sostre's long confinement with some particularity because Judge Motley found as a matter of law, that (1) in view of those conditions, Sostre's punishment-- or any confinement in segregation under similar conditions for longer than 15 days-- was 'cruel and unusual' under the Eighth Amendment; (2) this absolute rule aside, Judge Motley held that the penalty inflicted upon Sostre was so disproportionate to the offenses charged against him that his segregation would have been cruel and unusual even crediting each of Follette's assigned justifications for it. We cannot approve these conclusions. Our reasons for refusing to do so are based in part on undisputed facts in the record which do not appear in Judge Motley's otherwise entirely accurate description of Sostre's segregated environment. The following account draws upon those undisputed facts which do not appear in the opinion below, as well as those which do, in an effort to present the whole fabric.
 
 1. Isolation from Human Contact
 
 18
 Although for four months only one other prisoner was confined with Sostre in his small 'segment' of five cells, the entire punitive segregation unit at Green Haven housed on the average about 15 prisoners at any one time. During the period between June 28, 1967, and September 18, 1968, 179 prisoners were held in segregation for a total of 8,960 days. From September 19, 1968 to July 3, 1969, when Sostre was there, a total of 79 inmates were segregated at Green Haven. Of these, about ten percent were held in 'protective' segregation. This term is used to describe those who are segregated from the general population to protect them from harm rather than as punishment. These prisoners were incarcerated in cells entirely separated from Sostre's cell in the punitive segregation unit. The other prisoners were confined in cells near Sostre's, so that he would have been able to communicate with them, albeit with some difficulty depending on the distance between Sostre and the other prisoners. We are informed of an incident where one prisoner brought to solitary and placed in another group of cells committed suicide. Sostre was able to communicate with this inmate and indeed was able to dictate a legal document to him.
 
 
 19
 Finally, although we do not doubt that 'the crux of the matter is human isolation,' as Judge Motley observed, Sostre aggravated his isolation by refusing to participate in a 'group therapy' program offered each inmate in segregation beginning October or November 1968. 'Therapy' sessions were conducted in groups of about eight per class, generally one each week or ten days, under the guidance of a 'recreation supervisor,' Sergeant Louis Profera. Profera had been trained in group counseling in a six month, 40-hour course by a psychiatrist at the New York State Vocational Institution. Special rules for punitive segregation posted in the segregation unit provided that inmates in punitive segregation would be 'returned to the general population after demonstrating their willingness to accept and adhere to the institutional rules and regulations as shown by their participation in group counselling sessions. * * * Refusal to participate in group counselling is indicative of the inmate's unwillingness to accept and abide by the rules and regulations of the institution.' Profera's favorable recommendation generally resulted in a prisoner's release from segregation. Although one prisoner who testified at trial returned to the general population without participating in group therapy, there is no doubt that there was significant pressure to participate. Expert witnesses at trial disagreed as to whether coercion would increase or decrease the efficacy of group therapy.[6]
 
 
 20
 2. Other Conditions of Sostre's Segregated Confinement
 
 
 21
 Judge Motley heard extensive testimony describing such important details as Sostre's diet, his opportunity for exercise, the hygienic conditions of his cell, and the possibility for intellectual stimulation. It can hardly be questioned that his life in segregation was harsher than it would have been in the general population, but neither was it clearly unendurable or subhuman or cruel and inhuman in a constitutional sense.
 
 
 22
 Thus, Sostre would not be served seconds of the main course upon his demand; but there was no testimony that he would have had that privilege in the general population. He was denied the dessert that would have been available to the general population; but apart from the dessert his diet still consisted of 2800 to 3300 calories a day.[7] Sostre remained in his cell at all times except for a brief period once each week to shave and shower. An hour of exercise with four or five other prisoners in a small, enclosed yard, open to the sky was a daily routine. But the record reveals that Sostre refused this privilege because he would not submit to a 'strip search.' Officials testified that it was necessary to subject prisoners to such an examination each time they entered the exercise yard to prevent them from concealing on their bodies small bits of wire or other material suitable for use as a weapon.
 
 
 23
 Hygienic conditions were at least minimally adequate to permit Sostre to remain clean and healthy. Thus, Sostre was allowed to shave and shower with hot water once each week. The furnishings of his normal-sized (6 ft. x 8 ft.) cell included a toilet and a face bowl with running cold water, and he was provided with soap and a towel.
 
 
 24
 The strictures on Sostre's intellectual fare were severe. He could not buy or receive books, magazines or newspapers, and his access to the prison's library collection was limited to a selection among approximately thirty-five volumes, mostly 'shoot-em-ups' as Sostre described them, chosen by the prison guards. Still, light from a single bulb, controlled by the guards and usually turned on early in the morning and off at 10 p.m., was adequate for reading. And although he could not attend school or watch television, as could the inmates in the general population, any material related to the law requested by him would be brought to his cell.
 
 3. Length of Segregated Confinement
 
 25
 Pursuant to the usual practice at Green Haven, Sostre was sentenced to 'solitary' confinement for an indefinite period. According to New York Correction Law Section 140, 'submissiveness' was to be the touchstone for his release. Follette testified that Sostre could have returned to the general population either by successful participation in group therapy or by agreeing to live by the rules of the prison. Sostre's contention is that he refused to agree to obey rules that he considered an infringement of his constitutional rights.
 
 C. Censorship and Possession of Literature
 
 26
 Defendant Follette censored Sostre's correspondence with Joan Franklin of the NAACP, the attorney of record representing Sostre on appeal from his conviction. Follette regularly excised from letters passing between Sostre and Miss Franklin 'objectionable' material-- anything which 'in his judgment was not relevant to Sostre's appeal.' In accordance with Rule 47 of the Inmate Rule Book which restricts inmates' correspondence to persons on an approved mailing list, Warden Follette in late September, 1968, refused to forward a letter from Sostre to the United States Post Office Inspector, in which Sostre complained of Green Haven's practice of not returning to prisoners receipts for certified mail. The district judge found that each of these actions violated Sostre's First Amendment right to freedom of speech.
 
 
 27
 About August 3, 1969, a month after his release from segregation, Sostre was deprived of the use of the prison exercise yard and the privilege of attending movies because he possessed 'inflammatory racist literature' in his cell. The literature consisted of articles written by Sostre himself on paper properly in his possession. Most of the articles consisted of extracts from magazines and newspapers which Sostre was also permitted to have and read in his cell. The extracts included quotations from Mao Tse Tung, poetry written by a prison inmate, the names of the officers, the party program, and rules of conduct of the Black Panther Party; the officers and oath of allegiance of the Republic of New Africa; a 'program' for Black Student Unions; and the poem 'If We Must Die,' by Claude McKay. In addition, guards found in Sostre's cell an article which he had written himself, entitled 'Revoluntionary Thoughts.' The district court found that Sostre's punishment for possessing this material constituted another infringement of his freedom of expression.[8]
 
 III.
 THE DISTRICT COURT'S ORDER
 
 28
 Upon these findings which we have necessarily sketched, Judge Motley on May 14, 1970, entered the following order, which because of its complexity and importance to the questions we must decide, we reproduce in full. The district court subsequently granted a stay of its order pending appeal as to the bracketed portions. A stay as to the remainder of the order was denied.
 
 
 29
 It is now ordered, that defendants Follette, McGinnis and Mancusi, their employees, agents, successors, and all persons in active concert and participation with them be, and they are hereby, perpetually enjoined and restrained from:
 
 
 30
 1) Returning plaintiff to punitive segregation for charges previously preferred against him;
 
 
 31
 2) Placing plaintiff in punitive segregation or subjecting him to any other punishment as a result of which he loses accrued good time credit or is unable to earn good time credit, without:
 
 
 32
 a. giving him, in advance of a hearing, a written copy of any charges made against him, citing the written rule or regulation which it is charged he has violated;
 
 
 33
 b. granting him a recorded hearing before a disinterested official where he will be entitled to cross-examine his accusers and to call witnesses on his own behalf;
 
 
 34
 c. granting him the right to retain counsel or to appoint a counsel substitute;
 
 
 35
 d. giving him, in writing, the decision of the hearing officer in which is briefly set forth the evidence upon which it is based, the reasons for the decision, and the legal basis for the punishment imposed.[9]
 
 
 36
 (3) Censoring, refusing to mail or refusing to give to Sostre: 1) Any communication between Sostre and the following-- (a) any court; (b) any public official or agency; (c) any lawyer; (d) his co-defendant in the criminal matter pending against him; and, 2) Any letter relating to any legal matter to or from any other inmate who requests the assistance of Sostre in translating that letter into English.)
 
 
 37
 4) Punishing Sostre for sharing with other inmates his law books, law reviews, and other legal materials, and from refusing to permit Sostre to assist any other inmate in any legal matter as long as defendants have not provided any court approved alternative means of legal assistance for such inmates.
 
 
 38
 (5) Punishing Sostre for having in his possession political literature and for setting forth his political views orally or in writing, except for violation of reasonable rules approved by the court regulating freedom of speech.)
 
 
 39
 (It is further ordered that the above named defendants submit, within 90 days from the date of this order, for approval by this court, proposed rules and regulations governing the following:
 
 
 40
 1) the receipt, distribution, discussion and writing of political literature;
 
 
 41
 2) all future disciplinary charges and hearings with respect thereto where the possible punishments include solitary confinement, punitive segregation or any other segregation, and any other punishment in connection with which there is loss of, or inability to earn, good time credit.)
 
 
 42
 It is further ordered that the above named defendants and their agents credit plaintiff with the 124 1/3 days of good time credit which he was unable to earn while wrongfully incarcerated in punitive segregation from June 25, 1968 to July 2, 1969.
 
 
 43
 (It is further ordered that the plaintiff, Martin Sostre, recover of the defendants, Warden Follette, and Commissioner McGinnis the sum of $13,020.00.)
 
 IV.
 
 44
 PUNISHMENT FOR POLITICAL BELIEFS AND LEGAL ACTIVITIES
 
 
 45
 The question as to the propriety of withdrawing from incarcerated individuals constitutional privileges enjoyed by citizens of the community, although troublesome, is not new to the courts. It is clear that in many respects the constitutionally protected freedoms enjoyed by citizens-at-large may be withdrawn or constricted as to state prisoners, so far as 'justified by the considerations underlying our penal system,' Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Federal courts have been reluctant to intrude themselves into the complex and delicate problems of prison administration. E.g., United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir.), cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1964); Hatfield v. Bailleaux, 290 F.2d 632, 640 (9th Cir. 1961); Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963). The time is long since past, however, when a court might describe a prisoner as temporarily 'a slave of the state,' Ruffin v. Commonwealth, 62 Va. (21 Gratt.) 790, 796, or treat him as such. Among those rights not taken from Sostre when he entered Attica, either 'expressly or by necessary implication,' Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), is freedom from discriminatory punishment inflicted solely because of his beliefs, whether religious or secular. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam) (unlawful to withdraw prison privileges because of inmate's religious faith); see Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam) (racial segregation); Fulwood v. Clemmer, 206 F.Supp. 370, 373-374 (D.C.D.C.1962) (religious discrimination). Moreover, the Constitution protects with special solicitude, a prisoner's access to the courts. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Accordingly, Sostre's lengthy confinement to segregation violated due process of law if, as the district court found, Warden Follette inflicted the punishment either because of Sostre's militant political ideas or his litigation, past or threatened, against Follette or other state officials.
 
 
 46
 Sostre does not shrink from characterizing himself as a 'jailhouse lawyer' and the record before us does justice to this label, as does the history of Sostre's earlier period of confinement in New York prisons from 1952-64 following his first conviction for selling narcotics. It is not unreasonable to suppose, as the district court apparently did, that Warden Follette was aware of Sostre's Black Muslim activities during that period; of his solitary confinement in Attica Prison for four years, resulting from his religious activism; and of his success in securing through earlier litigation before this court the recognition of certain constitutional liberties for state prisoners. See Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964). Sostre's version of his June 25, 1968, interview with Follette, if believed, was a proper basis for Judge Motley's conclusion that Follette committed Sostre to segregation, if not in retaliation for his black militancy or past litigation, then at least to squelch Sostre's threat to take Follette to court over his censorship of Sostre's correspondence. Some substantiation for Sostre's account might be inferred from Follette's summary commitment of Sostre, without following the practice described in the New York Department of Correction's Employees' Rule Book (Rule 8.4), requiring trial by a 'disciplinary officer or court.'
 
 
 47
 On this evidence, we cannot conclude that the district judge was 'clearly erroneous' in attributing improper motives to Follette, affording as we must 'due regard * * * to the opportunity of the trial court to judge of the credibility' of Sostre and Follette, F.R.Civ.P. 52(a). See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (reviewing court may overturn finding if on the entire evidence it is left with the definite and firm conviction that a mistake has been made). On the other hand, McGinnis was not privy to Follette's interview with Sostre. The record is barren of any justification for attributing to him, in sanctioning Sostre's continued confinement, any more sinister motive than appropriate deference to the judgment of Warden Follette. McGinnis on the record before us, had no reason to suspect Follette of other than proper motivation.[10]
 
 V.
 CRUEL AND UNUSUAL PUNISHMENT
 
 48
 A reflection of maturing sensitivity in this country to the condition of some of our prisons may be seen in the district court's finding that deprivations such as Sostre endured for a year may not again be inflicted on New York State prisoners for longer than fifteen days, and only then for serious violations of prison rules. Otherwise, Judge Motley held, such punishment would run ashoal of the Eighth Amendment prohibition of cruel and unusual punishment, as applied to the states through the due process guarantee of the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
 
 
 49
 We respect the outrage, given form and content by scholarly research and reflection, that underlay the expert testimony at trial of Sol Rubin, for many years Counsel for the National Council on Crime and Delinquency, and Dr. Seymour Halleck, a psychiatrist at the University of Wisconsin with long experience in state correctional practices. Mr. Rubin testified that Sostre's segregated environment was degrading, dehumanizing, conducive to mental derangement, and for these reasons 'a gross departure' from enlightened and progressive contemporary standards for the proper treatment of prison inmates. Dr. Halleck feared that the isolation from human contact in punitive segregation might cause prisoners to hallucinate and to distort reality. Long-term isolation might have so serious an impact, in fact, as to 'destory' a person's 'mentality.' Dr. Halleck singled out for particular censure Green Haven's 'group therapy' program, whose compulsory aspects he found repugnant to effective treatment of participants and indeed inconsistent with minimal standards of professionalism among trained group counsellors.[11]
 
 
 50
 Nor would candor permit us to dismiss these opinions as aberrational among those views revealed in relevant sources referred to us by counsel or known to us through our own research. To the contrary, it would not be misleading to characterize many of the opinions of plaintiff's experts as fairly representative of the perspective of adherents to the 'new penology,' see Knuckles v. Prasse, 302 F.Supp. 1036, 1047-1048 (E.D.Pa.1969), the thrust of whose doctrine may be gauged by the preference for the adjective 'correctional' rather than 'penal' as more accurately indicating the proper function of a prison system.[12] The rapidly rising standards in the field of penology and corrections that Mr. Rubin referred to in his testimony are reflected in a growing preoccupation with institutional strictures and techniques designed to 'reintegrate' prisoners with society or, in the jargon of the experts, to 'provide * * * motivation for acquiring a conventional role in a non-delinquent setting.'[13] Conjugal visiting, daytime work or educational-release programs, vocational training, half-way houses, and inmate publication of prison newspapers are some of the vanguard weapons in the 'modern' approach to prison administration. The key concepts are access and involvement of prisoners with the free society 'on the outside.'[14] Anathema to this perspective are perhaps more traditional practices which subject prisoners to deprivation, degradation, subservience, and isolation, in an attempt to 'break' them and make them see the error of their ways.[15] It is suggested by many observers that such techniques are counter-productive, tending only to instill in most prisoners attitudes hostile to rehabilitation, summarized by one author as 'doubt, guilt, inadequacy, diffusion, self-absorption, apathy (and) despair.'[16]
 
 
 51
 We do not question, either, the relevance to an inquiry under the Eighth Amendment of opinions which may represent a progressing sense of humaneness as well as a new calculation as to the efficacy of penal practices. See Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Eighth Amendment invokes 'the evolving standards of decency that mark the progress of a maturing society').
 
 
 52
 For a federal court, however, to place a punishment beyond the power of a state to impose on an inmate is a drastic interference with the state's free political and administrative processes. It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us as a federal court to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or personally repugnant. As judges we are obliged to school ourselves in such objective sources as historical usage, see Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1870), practices in other jurisdictions, see Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and public opinion, see Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), before we may responsibly exercise the power of judicial review to declare a punishment unconstitutional under the Eighth Amendment.
 
 
 53
 Accordingly, we have in the past declined to find an Eighth Amendment violation unless the punishment can properly be termed 'barbarous' or 'shocking to the conscience.' See Church v. Hegstrom, 416 F.2d 449, 451 (2d Cir. 1969). Although the conditions Sostre endured were severe, we cannot agree with the district court that they were 'so foul, so inhuman, and so violative of basic concepts of decency,' Wright v. McMann, 387 F.2d 519 (2d Cir. 1967),[17] as to require that similar punishments be limited in the future to any particular length of time. Nor can we agree that Sostre's own long confinement-- however contrary such prolonged segregation may be to the views of some experts-- would have been 'cruel and unusual' had Sostre in fact been confined for the reasons asserted by Warden Follette, rather than on account of his beliefs and litigiousness.
 
 
 54
 It is undisputed on this appeal that segregated confinement does not itself violate the Constitution. See Burns v. Swenson, 430 F.2d 771 (8th Cir., Aug. 31, 1970); Courtney v. Bishop, 409 F.2d 1185 (8th Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967); United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965); Krist v. Smith, 309 F.Supp. 497 (S.D.Ga.1970); Roberts v. Barbosa, 227 F.Supp. 20 (S.D.Cal.1964). Indeed, we learn that a similar form of confinement is probably used in almost every jurisdiction in this country and has been described as one of 'the main traditional disciplinary tools' of our prison systems. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 50-51 (1967); S. Rubin, et al., The Law of Criminal Corrections 293 (1963).[18] Plaintiff has directed our attention to currently operative rules in other jurisdictions which limit the duration of segregated confinement, and to several commentaries recommending or approving such rules.[19] In several states, however, incarceration in segregated cells seems to be for an indefinite period, as it is in New York.[20] The federal practice appears to be that prisoners shall be retained in solitary 'for as long as necessary to achieve the purposes intended,' sometimes 'indefinitely.' Furthermore, 'willful refusal to obey an order or demonstrated defiance of personnel acting in line of duty may constitute sufficient basis for placing an inmate in segregation.'[21] 1] Such analogous practices[22] do not impel us to the conclusion that the Eighth Amendment forbids indefinite confinement under the conditions endured by Sostre for all the reasons asserted by Warden Follette until such time as the prisoner agrees to abide by prison rules-- however counter-productive as a correctional measure or however personally abhorrent the practice may seem to some of us.
 
 
 55
 In arriving at this conclusion,[23] we have considered Sostre's diet, the availability in his cell of at least rudimentary implements of personal hygiene,[24] the opportunity for exercise[25] and for participation in group therapy,[26] the provision of at least some general reading matter from the prison library and of unlimited numbers of law books, and the constant possibility of communication with other segregated prisoners. These factors in combination raised the quality of Sostre's segregated environment several notches above those truly barbarous and inhumane conditions heretofore condemned by ourselves and by other courts as 'cruel and unusual.'[27] See Ford v. Board of Managers, 407 F.2d 937 (3rd Cir. 1969) (no running water or wash bowl; bread and water diet except one regular meal each third day; held constitutional); Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966), cert. denied, 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969) (400 days segregation held constitutional).
 
 
 56
 Finally, we cannot agree with Judge Motley that even if New York might in an appropriate case subject a prisoner to the conditions of Sostre's segregated confinement, had Follette's motives been as he described them, the punishment would in any event have been unconstitutionally disproportionate to the offense. Were we to rule otherwise, we would deny to prison authorities the power to use an entirely constitutional means of discipline in response not only to a credible threat to the security of the prison, but in response to a prisoner's refusal to answer appropriate questions put by prison authorities and to obey valid prison regulations.[28]
 
 VI.
 PROCEDURAL DUE PROCESS
 
 57
 A divergence of perspectives similar to those we have seen in considering the Eighth Amendment issue is presented in another form by the district court's order that Sostre may not be punished in the future in such a way as to forfeit earned 'good time' credit or to lose the chance to earn such credit unless he has (a) written notice of the charges against him; (b) a recorded hearing before a disinterested official with a chance to cross-examine adverse witnesses and call witnesses in his own behalf; (c) the right to retain counsel or counsel substitute; and unless (d) a written decision is rendered.[29]
 
 
 58
 Sostre presses upon us a variety of cases, relied upon by the district court and said to be analogous to this case, in which federal courts have required states to square corners before exacting a penalty by following procedures similar to those mandated by Judge Motley. Particular importance is attached to Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), where the Supreme Court announced that before states may terminate welfare payments they must adopt 'minimum procedural safeguards' and afford those who are to suffer loss 'rudimentary due process,' including advance written notice and a hearing at which the welfare recipient may cross-examine adverse witnesses and be represented by counsel. In addition, there must be a written statement of reasons for any termination, including some indication of the evidence supporting the adverse decision.
 
 
 59
 Our recent decision in Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970), instructed that a state's withdrawal of the 'privilege' of residing in a public housing project was onerous enough to require it to provide those affected with adequate advance notice, a hearing, access to adverse evidence, cross-examination of adverse witnesses, full disclosure of rules governing the hearing, and a reasoned decision based solely on the evidence adduced at the hearing.
 
 
 60
 Somewhat closer in point to the present case is Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The court held that representation of petitioners by counsel was essential to the fairness of their deferred sentencing proceedings.[30] The imposition of sentence had been suspended and the petitioners placed on probation. In the proceedings under review, defendants were faced with both sentencing and imprisonment on the first convictions for committing second offenses while out on probation. The supreme Court determined that defendants should have been represented by counsel. Legal skills, the Court reasoned, would have aided petitioners in 'marshalling the facts' and might have ensured that important legal rights were not lost because unexercised at that stage.
 
 
 61
 Federal courts disagree as to the reach of Mempa to probation revocation proceedings generally. See the extensive citation of cases in Hewett v. North Carolina, 415 F.2d 1316, 1322 (4th Cir. 1969). In Hewett the court decided that counsel was a necesary component of fundamental fairness at a probation revocation hearing, 'the event which makes operative the loss of liberty,' because a trained lawyer might have prevented the admission against defendant of improper evidence, and, through appropriate objections, exceptions, and assignments of error, have preserved defendant's right to appeal.
 
 
 62
 Escalera and Goldberg are persuasive recent authority that states may not avoid the rigors of due process by labelling an action which has serious and onerous consequences as a withdrawal of a 'privilege' rather than a 'right.'[31] Mempa warns us that procedural formality may be required in the operation of the criminalization and incarceration process beyond the determination of guilt at trial. Thus, we do not doubt that Sostre was entitled to 'due process of law' before he was punished for an infraction of prison rules. The exaction of segregated confinement was onerous indeed,[32] and the distinction between a 'right' and a 'privilege'-- or between 'liberty' and a 'privilege' for that matter-- is nowhere more meaningless than behind prison walls.[33] The difficult question, as always, is what process was due. In answering that question, we may not uncritically adopt the holdings of decisions that take color from contexts where the shadings are as different from the instant case as the cases we have discussed:
 
 
 63
 As a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.
 
 
 64
 Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960).
 
 
 65
 Beyond the process of guilt determination and initial incarceration, courts have displayed greater reluctance to import all the trappings of formal due process. Thus, a panel of this court has recently held that formal trial-type due process is not a requirement in connection with a parole release determination. Menechino v. Oswald, 430 F.2d 403 (1970).[34] Like the relationship between Menechino and the parole board, Follette's relation to Sostre should not be viewed as adversarial in the same sense that a criminal trial is adversarial. Certainly, formal rules of evidence would be entirely inappropriate at a disciplinary proceeding. To dispose sensitively and carefully of each prisoner's unique case with due regard for the effect of each decision on the total fabric of the prison community, prison authorities must have wide access to relevant information.[35] Since, in addition, there is no likelihood that substantial rights would be sacrificed if a prisoner failed, for example, to raise a proper objection or to take a timely appeal, the need for legal skills is less acute here than in Mempa, Townsend, or Hewett. Moreover, the evidence as to whether the prisoner has violated a prison regulation is likely to be simpler, more precise, and more readily at hand, than, for example, the evidence bearing on the question whether welfare payments should be terminated. There is correspondingly less need for cross-examination and calling of witnesses.
 
 
 66
 Most important, we think it inadvisable for a federal court to pass judgment one way or another as to the truly decisive consideration, whether formal due process requirements would be likely to help or to hinder in the state's endeavor to preserve order and discipline in its prisons and to return a rehabilitated individual to society. It would be too simplistic to dissociate the impact of punishment meted out after a disciplinary hearing from the method by which the hearing itself is conducted. As one court has observed: 'The association between men in correction institutions is closer and more fraught with physical danger and psychological pressures than is almost any other knid of association between human beings.' Edwards v. Sard, 250 F.Supp. 977, 981 (D.D.C. 1966). It is sad but true that the study of the prison subculture by psychologists and sociologists has until recently been largely neglected. Those who have looked into the problem, however, do not gainsay the volatility of relationships among prisoners and prison officials. See, e.g., Corrections 46-47; Gibbons, Changing the Law Breaker 200-12 (1965). We would not presume to fashion a constitutional harness of nothing more than our guesses. It would be mere speculation for us to decree that the effect of equipping prisoners with more elaborate constitutional weapons against the administration of discipline by prison authorities would be more soothing to the prison atmosphere and rehabilitative of the prisoner or, on the other hand, more disquieting and destructive of remedial ends. This is a judgment entrusted to state officials, not federal judges.[36]
 
 
 67
 We are particularly unwilling to interfere with state administrative processes when reliable, detailed information or empirical studies are as scanty as they are on the subject of prison disciplinary procedures. See Corrections at 16; D. Glaser, The Effectiveness of a Prison and Parole System 172 (1964) ('prison discipline * * * has not received extensive objective research by anyone'). Judge Learned Hand wisely instructed us 'constitutions are deliberately made difficult of amendment; mistaken readings of them cannot easily be corrected. Moreover, if they could be, constitutions must not degenerate into vade mecums or codes; when they begin to do so, it is a sign of a community unsure of itself and seeking protection against its own misgivings.' The Spirit of Liberty 179 (1952).
 
 
 68
 Analogies and recommendations called to our attention do not go far to advance Sostre's position. Neither the Model Penal Code nor the Manual of the American Correctional Association would require confrontation and cross-examination, calling of witnesses by the prisoner, counsel or counsel substitute, or a written statement of evidence and rationale.[37] Similarly, Rhode Island has voluntarily adopted new disciplinary procedures for its prisons, under court supervision, Morris v. Travisono, 310 F.Supp. 857 (D.R.I1970), which include provisions for a hearing, advance written notice, and assistance by a prison officer, but no other of the formal safeguards required by Judge Motley's injunction. Sostre has referred us to rules adopted for the Missouri State Penitentiary, under which prisoners are assisted during a disciplinary proceeding by a member of the prison staff and where there must be a written summary of the disciplinary proceeding, including a statement of relevant evidence. Personnel Information Pamphlet: Rules and Procedures 3-4 (Sept.1967). Again, however, there is no provision for calling witnesses or cross-examination.
 
 
 69
 Indeed, it appears that, among those practices known to us, only in the federal correctional system must a formal proceeding, including each of the elements in the district court's mandate, precede forfeiture of good time allowances. Bureau of Prisons, Policy Statement: Withholding, Forfeiture, and Restoration of Good Time (No. 7400.6 Dec. 1, 1966). Notably, however, these formalities need not accompany discipline that results in the withholding of good time credit, as Judge Motley would require.
 
 
 70
 We therefore find ourselves in disagreement with Judge Motley's conclusion that each of the procedural elements incorporated in her mandatory injunction are necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner. In thus rejecting Judge Motley's conclusions, however,[38] we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials.[39] If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see Armstrong v. Manzo,380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and afforded a reasonable opportunity to explain his actions,[40] See Nolan v. Scafati, 306 F.Supp. 1 (D.Mass.1969) (Wyzanski, J.).[41] See also, Shelton v. United States Board of Parole, 128 U.S.App.D.C. 311, 388 F.,2d 567, 576 (1967) (en banc). Cf. Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (conviction supported by no evidence violates due process); United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968) ('the relevant facts * * * must not be * * * capriciously or unreliably determined'); Dunn v. California Dept. Of Corrections, 400 F.2d 340, 342 (9th Cir. 1968); Williams v. Patterson, 389 F.2d 374 (10th Cir. 1968); Howard v. Smyth, 365 F.2d 428 (4th Cir.) cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966) (arbitrary and serious punishment of activities closely related to first amendment freedoms); Jones v. Rivers,338 F.2d 862, 874 (4th Cir. 1964); Hyser v. Reed, supra, 318 F.2d at 242 (basic fairness requires that federal parole not be revoked arbitrarily); United States ex rel. Wakeley v. Pennsylvania, 247 F.Supp. 7, 12 (E.D. Pa. 1965) (courts in these cases must locate the 'line that separates mere matters of discipline from arbitrary and capricious disregard of human rights').[42]
 
 VII.
 RIGHTS OF COMMUNICATION AND EXPRESSION
 A. Correspondence
 
 71
 The distaste with which some observers view prolonged segregated confinement attaches as well to that kind of isolation flowing from restrictions on and censorship of prisoners' correspondence:
 
 
 72
 The harm censorship does to rehabilitation cannot be gainsaid. Inmates lose contact with the outside world and become wary of placing intimate thoughts or criticisms of the prison in letters. The artificial increase of alienation from society is ill advised.[43]
 
 
 73
 The values commonly associated with free expression-- an open, democratic marketplace of ideas, the self-development of individuals through self-expression, the alleviation of tensions by their release in harsh words rather than hurled objects-- these values that we esteem in a free society do not turn to dross in an unfree one. 'Letter writing keeps the inmate in contact with the outside world, helps to hold in check some of the morbidity and hopelessness produced by prison life and isolation, stimulates his more natural and human impulses, and otherwise may make contributions to better mental attitudes and reformation.' Palmigiano v. Travisono, 310 F.Supp. 857 (D.R.I. Aug. 24, 1970). Suppression of diversity and dissenting views is probably not less apt in a prison than elsewhere to hasten the stagnation and bureaucratization of the institution that indulges in it. See T. Emerson, Toward a General Theory of the First Amendment 3-15 (1966).
 
 
 74
 Whatever wisdom there might be in such reflection, we cannot say with requisite certitude that the traditional and common practice of prisons in imposing many kinds of controls on the correspondence of inmates, lacks support in any rational and constitutionally acceptable concept of a prison system. See McCloskey v. Maryland, 337 F.2d 72, 74-75 (4th Cir. 1964) ('Control of the mail to and from inmates is an essential adjunct of prison administration'). See also, Diehl v. Wainwright, 419 F.2d 1309 (5th Cir. 1970); Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968); United States v. Stahl, 393 F.2d 101 (7th Cir.) cert. denied 393 U.S. 879, 89 S.Ct. 181, 21 L.Ed.2d 152 (1968); Carey v. Settle, 351 F.2d 483, 485 (8th Cir. 1965).[44] We note that Sostre did not contest the validity of Warden Follette's action in striking the name of his sister from the list of Sostre's authorized correspondents after it was learned that he was using letters addressed to his sister as vehicles for unauthorized correspondence. See fn. 4, supra. Discipline and prison order are sufficient interests to justify such regulation incidental to the content of prisoners' speech. See Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); Brennan, The Supreme Court and the Meikeljohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1, 11 (1965).
 
 
 75
 Sui generis in both logic and the case law, however, are letters addressed to courts, public officials, or an attorney when a prisoner challenges the legality of either his criminal conviction or the conditions of his incarceration. See, e.g., Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Cochran v. Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir. 1966) (nocensorship permitted of mail between inmate and court with jurisdiction to hear prisoner's complaints); McCloskey v. Maryland, supra; Stiltner v. Rhay, 322 F.2d 314, 316 (9th Cir.), cert. denied, 376 U.S. 920, 84 S.Ct. 678, 11 L.Ed.2d 615 (1963) ('reasonable access to the courts is basic to all other rights protected by' the Civil Rights Act). It would be inappropriate on constitutional grounds, ironic, and irrational to permit drastic curtailment of constitutional rights in the name of punishment and rehabilitation, while denying prisoners a full opportunity to pursue their appeals and postconviction remedies. The generous scope of discretion accorded prison authorities also heightens the importance of permitting free and uninhibited access by prisoners to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. The importance of these rights of access suggests the need for guidelines both generous and specific enough to afford protection against the reality or the chilling threat of administrative infringement.
 
 
 76
 Thus, we do not believe it would unnecessarily hamper prison administration to forbid prison authorities to delete material from, withhold, or refuse to mail a communication between an inmate and his attorney, see Burns v. Swensen, 430 F.2d 771, (8th Cir., Aug. 31, 1970) protecting correspondence with the ACLU), or any court, or any public official, unless it can be demonstrated that a prisoner has clearly abused his rights of access. Obviously, the transmittal of contraband or laying plans for some unlawful scheme would constitute such an abuse. In addition, if it were clear that a prisoner's recitation of complaints about his confinement in otherwise protected correspondence were a mere pretaxt to accomplish his sole motivating purpose of communicating instead about restricted matters, then prison officials may block the inmate's scheme by deleting that portion of such a communication unrelated to the complaints. See Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y. filed July 15, 1970); In re Ferguson, 55 Cal.2d 663, 12 Cal.Rptr. 753, 361 P.2d 417, Cert. denied sub nom. Ferguson v. Heinze,368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61 (1961). In such a case, the need to restrain the abuse outweighs the danger that prison authorities may by inadvertence or design hamper the prisoner's access.
 
 
 77
 On the other hand, if a communication is properly intended to advance a prisoner's effort to secure redress for alleged abuses, no interest would justify deleting material thought by prison authorities to be irrelevant to the prisoner's complaint. The danger that an official will improperly substitute his judgment for that of the correspondent's then preponderates. For similar reasons, prison officials may not withhold, refuse to mail, or delete material from otherwise protected communications merely because they believe the allegations to be repetitious, false, or malicious. See Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970) (absent some countervailing interest other than that prisoner's letter contained 'lies,' authorities may not prevent inmate from seeking legal assistance); Fulwood v. Clemmer, 206 F.Supp. 370, 377 (D.D.C.1962) (right to seek redress of grievances was abridged by punishment for alleged false accusations about prison conditions in prisoner's letter of complaint to public officials).
 
 
 78
 Accordingly, we agree with Judge Motley that it was improper for Warden Follette to delete material from correspondence between Sostre and his attorney merely because Follette thought the material irrelevant to Sostre's appeal of his conviction. We believe it was also improper for Follette to refuse to mail a letter of complaint to the Postal Inspector. We leave a more precise delineation of the boundaries of this protection for future cases. We need only add that when we say there may be cases which will present special circumstances that would justify deleting material from, withholding, or refusing to mail communications with courts, attorneys, and public officials, we necessarily rule that prison officials may open and read all outgoing and incoming correspondence to and from prisoners.
 
 B. Prisoner Legal Aid
 
 79
 Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), instructs that states must permit prisoners to help fellow inmates prepare habeas corpus petitions, subject to reasonable regulation, absent a sufficient showing by the state that through some other means it provides prisoners with an adequate substitute for the 'jailhouse lawyer.' Cf. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (state may not require that habeas petition be approved by a corrections official to see that it was 'properly drawn'); Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal., filed May 28, 1970) (3-judge court) (woefully inadequate prison law library held unlawfully restricts prisoners' access to courts). The failure of any such showing in this case makes it mandatory that New York permit prisoner aid to the extent required by Johnson. Johnson's explicit permission to states reasonably to regulate this right, however, validates the Green Haven rule requiring prisoners to apply to the Warden for permission to help other inmates with legal activities. There would be a violation of Johnson only if the Warden denied permission, or if the conditions on which he granted it were unreasonable.[45]
 
 
 80
 Since Sostre never requested permission, there is no cause for an injunction to enforce the Johnson rule. We assume that permission would be granted as a matter of course, subject only to reasonable conditions. Nor can we consider unreasonable the Green Haven rule forbidding prisoners from sharing their personal law books with one another. This regulation would not prohibit Sostre, for example, from recommending legal source material to other inmates. We do not see how they would be unduly burdened by being required to acquire the books through prison officials[46] rather than directly from Sostre. See Gilmore v. Lynch, supra (upholding prison rule prohibiting jailhouse lawyers from keeping in their cells legal material pertaining to other prisoners). In a closely related situation, we held that a prisoner could be refused permission to keep 'law books' in his cell where there was no allegation he was denied use of the prison library. Williams v. Wilkins, 315 F.2d 396, 397 (2d Cir. 1963). We cannot ignore the concern of prison officials that strongwilled inmates might exact hidden and perhaps non-monetary fees in return for nominally free privileges at the inmates' private lending library.[47]
 
 
 81
 C. Possession of Literature and Mere Expression of Beliefs
 
 
 82
 Our holding that prisoners may not be punished for their beliefs carries the necessary corollary that we may not permit punishment for the mere expression of those beliefs. One can hardly speak of beliefs apart from their expression, cf. Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962). In the absence of arbitrariness or discrimination, see Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966); Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961), and Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961), we do not say on this record that Warden Follette would have exceeded his legitimate authority if he had confiscated the writings that guards found in Sostre's cell following his release from segregation. Whatever doubts we might have as to the wisdom of seizing an inmate's political writings, we would not lightly overturn a warden's judgment that possession of the writings might subvert prison discipline if there existed the risk of their circulation among other prisoners.[48]
 
 
 83
 However, Sostre was punished simply for putting his thoughts on paper, with no prior warning and no hint that he intended to spirit the writings outside his cell. To sanction such punishment, even though in the judgment of prison officials the writings were 'inflammatory' and 'racist,' as in the instant case, would permit prison authorities to manipulate and crush thoughts under the guise of regulation. The intimidating threat of future similar punishment would chill a wide range of prisoner expression, not limited to that expression which Follette might in fact deem dangerous enough to discipline. The danger of undetected discriminatory punishment of ideas is particularly acutein the absence of statutory standards to guide the exercise of Follette's discretion. See, e.g., Cox v. Louisiana, 379 U.S. 536, 556-557, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Any real threat to prison security that Sostre's possession of his writings might have posed could have been met by confiscation rather than punishment. See Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).
 
 VIII.
 CONCLUSION
 
 84
 Because of the nature of this case, the multitude and complexity of claims raised and the extent of Judge Motley's considered opinion and the injunctive and other relief granted, we have been compelled to engage in this protracted exegesis. In light of what we have set forth, our conclusions follow.
 
 A. Injunctive
 
 85
 1. Although not necessary to the disposition of Sostre's complaint, the district court held that several elements of trial-type procedure, enumerated in its order, were required by due process in every instance of prisoner discipline resulting in withholding of good time credit ot the prisoner or loss of his opportunity to earn good time. Because of the importance of the question to the state of New York, and the frequency with which similar questions are being litigated in district courts of this jurisdiction, we are compelled to say that the district court was in error. All of the elements of due process recited by the district court are not necessary to the constitutionality of every disciplinary action taken against a prisoner. In light of this, we reverse the district court insofar as it enjoined defendants and others from so disciplining Sostre that he loses accrued good time credit or is unable to earn good time credit without full compliance with all the procedural steps set forth in Judge Motley's injunction. We do not thereby imply that discipline in New York prisons may be administered arbitrarily or capriciously. We would not lightly condone the absence of such basic safeguards against arbitrariness as adequate notice, an opportunity for the prisoner to reply to charges lodged against him, and a reasonable investigation into the relevant facts-- at least in cases of substantial discipline. However, as consideration of Sostre's case does not properly raise any question whether New York prisons regularly or systematically ignore minimal due process requirements, we must reverse the order of the district court that defendants submit for its approval, proposed rules and regulations governing future disciplinary actions. In this connection, we note that New York State has recently promulgated rules and regulations governing prison discipline which appear to give inmates new procedural protections.[49]
 
 
 86
 2. The refusal to mail Sostre's letter to the Post Office Inspector, complaining of prison practices, clearly infringed Sostre's Fourteenth Amendment rights. We also affirm Judge Motley's order insofar as it enjoins defendants Follette and McGinnis, their employees, agents, successors, and all persons in active concert and participation with them, from deleting material from, refusing to mail or refusing to give to Sostre: (1) Any communication between Sostre and the following-- (a) any court; (b) any public official or agency; or (c) any lawyer -- with respect to either his criminal conviction or any complaint he may have concerning the administration of the prison where he is incarcerated. We reverse, however, insofar as Judge Motley enjoined nonarbitrary restraint of communication between Sostre and his co-defendant in the criminal matter pending against him.
 
 
 87
 3. There is no cause for an injunction to enforce the principles announced in Johnson v. Avery, supra, since no infractions of those principles have been shown. Johnson v. Avery permitted reasonable rules regulating the conduct of inmates in assisting other inmates in legal proceedings. Sostre has not proved that the rules regulating his right to assist other prisoners in their legal affairs were unreasonable and that his punishment was for violating such rules. Therefore, we must reverse the district court insofar as it enjoined interference with Sostre's translation of letters of fellow-inmates since he had failed to comply with the rule requiring that he seek permission of the warden. For the same reason, we reverse the injunction against punishing Sostre for sharing with other inmates his law books, law reviews, and other legal naterials, and from refusing to permit Sostre to assist any other inmate in any legal matter.
 
 
 88
 4. We have held that Sostre was improperly punished for possession of constitutionally protected literature. We perceive no reason, however, to set political speech apart from other kinds of constitutionally protected speech. We therefore modify the district court order so as to enjoin defendants Follette and McGinnis, their employees, agents, successors, and all persons in active concert and participation with them, from punishing Sostre for having literature in his possession and for setting forth his views orally or in writing, except for violation of reasonable regulations. We do not hereby enjoin officials from taking reasonable measures to prevent prisoners from inciting disturbances and otherwise to protect the security and order of New York prisons, consistent with prisoners' rights to freedom of expression. Also we do not believe that there is any need for the extraordinary procedure requiring defendants to submit rules and regulations governing the receipt, distribution, discussion and writing of political literature for the approval of the district court.
 
 
 89
 5. We have no reason to conclude that New York prison officials will not abide by the constitutional rights of prisoners as we define them today. We have refused to set aside Judge Motley's findings that Warden Follette unlawfully committed Sostre to segregated confinement because of his legal activities and beliefs. Warden Follette, however, is deceased and we perceive no threat that others will duplicate his improper conduct. Accordingly, we vacate that portion of the district court order which enjoined defendants and others from returning Sostre to punitive segregation for charges previously preferred against him.
 
 B. Good Time Credit
 
 90
 Since we have held that Sostre was unlawfully confined to punitive segregation on account of his political beliefs and legal activities, we agree with Judge Motley's order requiring Sostre to be credited with 124 1/3 days of earned 'good time.' Sostre may not be penalized because of his time in segregation by remaining incarcerated longer or by becoming eligible for parole later than he otherwise would. We do not consider the argument that Sostre may not have earned the credit even if he had remained in the general population to be of substance. Whether he would or would not have earned it is pure speculation. Since Sostre's constitutional rights have been violated, we resolve the doubt in his favor. Moreover, this is the only feasible way to ensure that Sostre is not again unlawfully penalized by arbitrary action.[50]
 
 C. Money Damages
 
 91
 All parties seem to agree upon two principles with which we also are in accord. First, Section 1983 authorizes recovery of compensatory, and, in an appropriate case, punitive damages against an individual for the unjustifiable violation of constitutional rights 'under color' of state law. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965). This liability, however, is entirely personal in nature intended to be satisfied out of the individual's own pocket. Moreover, the doctrine of sovereign immunity, as codified by the Eleventh Amendment, bars the exaction of a fine from a state treasury without the state's consent, at least on account of tortious actions committed by its agents under the circumstances of this case. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Westberry v. Fisher, 309 F.Supp. 12 (D.Me.1970).
 
 
 92
 It follows from these principles[51] that although Sostre was entitled to compensatory damages against Warden Follette,[52] Follette's successor as warden, who had no part whatsoever in Follette's wrongful conduct against Sostre, incurred no personal money responsibility upon Follette's death. We note also that no application was made in the court below to substitute any party who could be held responsible to assume Follette's obligation to Sostre, Rule 25, F.R.Civ.P., if such a party existed. Accordingly, there is no party before us against whom appropriately to award damages.[53]
 
 
 93
 In any event, we are persuaded to reverse the award of punitive damages. Warden Follette's improper conduct in segregating Sostre so far as appears reflected no pattern of such behavior by himself or by other officials. The deterrent impact of a punitive award would be of minimal use. See Green v. Wolf Corp., 406 F.2d 291, 303 (2d Cir. 1968), cert. denied sub nom. Troster, singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).
 
 
 94
 It is appropriate, lest our action today be misunderstood, that we disclaim any intent by this decision to condone, ignore, or discount the deplorable and counter-productive conditions of many of this country's jails and prisons. We strongly suspect that many traditional and still widespread penal practices, including some which we have touched on in this case, take an enormous toll, not just of the prisoner who must tolerate them at whatever price to his humanity and prospects for a normal future life, but also of the society where prisoners return angry and resentful. Nevertheless, we would forget at our peril and at the peril of our free governmental process, that we are federal judges reviewing decisions made in due course by officers of a sovereign state. We have interpreted and applied the law as it appears to us in light of circumstance and principle. We do not doubt the magnitude of the task ahead before our correctional systems become acceptable and effective from a correctional, social and humane viewpoint, but the proper tools for the job do not lie with a remote federal court. The sensitivity to local nuance, opportunity for daily perseverance, and the human and monetary resources required lie rather with legislators, executives, and citizens in their communities. See, Amsterdam, The Supreme Court and the rights of Suspects in Criminal Cases, 45 N.Y.U.L.Rev. 785, 810 (1970).
 
 
 95
 We wish to express our appreciation to Sostre's appointed counsel, Victor Rabinowitz, Kristin Booth Glen, and David Rosenberg, for their thorough and excellent presentation of this appeal.
 
 LUMBARD, Chief Judge (concurring):
 
 96
 I concur in Judge Kaufman's thorough opinion except as to Section VI regarding Procedural Due Process. While I agree in reversing those provisions of paragraph 2 of the order of the district court, I see no need to express any opinion on what the New York State authorities should do when determining whether or not to withhold or withdraw good time credit, or the general principles which should govern such situations.
 
 WATERMAN, Circuit Judge (concurring):
 
 97
 I concur in each of the results reached in the majority opinion. Nevertheless, I am concerned that the discussion there with reference to Due Process rights of a state prisoner who is threatened with loss of good time credit or with a loss of the chance to earn such credit because of an alleged infraction of prison rules would seem inaccurately to portray the obligation of a federal court asked to 'interfere with state administrative processes' on constitutional grounds. I submit that it is our duty, mandated by the U.S. Constitution, authorized by Congress,[1] and demanded by conscience, to strike down any practice sanctioned by a State which does not conform to at least minimally acceptable levels of due process. The court, aptly noting that appellant has asked us to determine what process is constitutionally due him, a convicted and imprisoned felon, declines to determine the 'truly decisive issue' because it lacks empiric information.[2] While I most assuredly agree that studies and surveys and the presentation thereof to us might provide further information of value in balancing competing interests, their absence should never mean that the federal courts will ignore or condone state activity obviously violative of individual rights when that activity is indulged in under the guise of preserving order.
 
 
 98
 J. JOSEPH SMITH, Circuit Judge (concurring in part and dissenting in part):
 
 
 99
 I agree with most of Judge Kaufman's thoughtful and thorough opinion, but disagree in two respects and therefore dissent in part.
 
 
 100
 I agree with Judge Feinberg that the district court's finding that Sostre's segregation for more than one year was cruel and unusual punishment is supported by the record. Punishment of a nature found likely to bring about an inmate's insanity should be proscribed whether or not it is shown to have succeeded in doing so in the particular case, and whether or not it could be alleviated by 'submission.'
 
 
 101
 This requires also, it seems to me, that recovery against McGinnis be upheld. The court found (and Judge Kaufman's opinion emphasizes, page 182 and page 189) that McGinnis had been fully informed as to Sostre's long segregation, a finding supported by the Follette deposition testimony and exhibits, and had done nothing to terminate it although empowered to do so, and although he knew Follette had kept men in segregation for periods as long as four and five years in the past. Follette was liable in damages to Sostre for violation of his civil rights, and I would rule that McGinnis was properly held also liable. I would not, however, assess exemplary in addition to compensatory damages against McGinnis under these circumstances.
 
 
 102
 FEINBERG, Circuit Judge (dissenting and concurring):
 
 
 103
 Because I agree with most of the exhaustive majority opinion, I regret that I find it necessary to dissent from the treatment of the cruel and unusual punishment point and from the reversal as to defendant McGinnis. As to the former, the majority opinion reaches three results, from each of which I dissent. The most important of these is the refusal to hold that there must be a definite limit on how long a prisoner may be kept in punitive segregation, or solitary confinement.[1] The majority holds that for 'serious' offenses, the Constitution requires no limit so long as the prisoner has the option of submitting to prison discipline. Second, the majority holds that Sostre's alleged offenses considered together would have been 'serious,' if Warden Follette had acted for proper motives. Third, even though the warden's motives were 'improper,' the majority refuses to rule that Sostre's punishment was cruel and unusual.
 
 
 104
 Before considering these three aspects of the majority opinion, it must be emphasized that Sostre was segregated for over a year and, as Judge Motley noted, would in all likelihood still be effectively isolated but for the intervention of the district court. There is an intimation in the majority opinion that Sostre was not effectively cut off from usual day to day contact with other human beings,[2] but the district judge's opinion makes clear that he was. The district judge and the majority both agree that 'the crux of the matter is human isolation,' and the district court opinion sets forth in melancholy detail the conditions that were imposed upon Sostre and the reasons why. I will not repeat them here except to note that the full vindictive flavor of defendants' treatment of Sostre is indicated by one incident, relegated to a footnote in the majority opinion. The day after Judge Motley ordered Sostre's release from over a year of segregation, he was again disciplined for having 'dust on his cell bars.' This caused him to miss the regular July 4th celebration, which would have brought him in contact with prisoners from another part of the prison, such contact being permitted only once a year on July 4. Judge Motley found that the punishment was imposed upon Sostre in retaliation for his legal success before her.
 
 
 105
 The district judge found that the isolation imposed on Sostre was 'dangerous to the maintenance of sanity' and "could only serve to destroy completely the spirit and undermine the sanity of the prisoner." 312 F.Supp. 863, 868, 871 (S.D.N.Y.1970), quoting Wright v. McMann, 387 F.2d 519, 526 (2d Cir. 1967). This was a finding of fact. The judge also concluded as a matter of law that 'subjecting a prisoner to the demonstrated risk of the loss of his sanity as punishment for any offense in prison is plainly cruel and unusual punishment as judged by the present standards of decency.' Id. at 871. The majority opinion does not make explicit whether it overrules the judge's finding of fact, although it hints that it does.[3] But in order to reverse the district court on this issue the majority must hold either that Judge Motley's finding of fact is clearly erroneous or that, even if true, the punishment imposed on Sostre did not amount to cruel and unusual punishment as a matter of law. Neither holding would be justified.
 
 
 106
 As to the first, it is difficult to see how Judge Motley's factual finding that Sostre's isolation threatened sanity could be characterized as clearly erroneous. Testimony at trial from experts with impressive credentials clearly supported that finding. Dr. Halleck, in response to a hypothetical question outlining the conditions of Sostre's punishment, stated that they could undermine the prisoner's sanity. Sol Rubin supported that view. It is true that Dr. Johnston, testifying for the State, disagreed. But while the district judge, as trier of fact, was free to believe the experts for plaintiff or for defendants, we may do neither. The trial judge chose to believe the former, and I do not see how her finding on this evidence can be characterized as clearly erroneous.
 
 
 107
 On the second assumption, what the majority does is to hold that Sostre's lengthy, unlimited isolation, which was 'dangerous' to his sanity, does not violate the eighth amendment. With deference, I disagree. The standard for determining 'cruel and unusual punishment' has been expressed in a number of ways, all imprecise; e.g., 'the wanton infliction of pain,' Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947); conduct which 'shocks the most fundamental instincts of civilized man,' id. at 473, 67 S.Ct. at 381 (dissenting opinion); a method of punishment which violates the 'evolving standards of decency that mark the progress of a maturing society,' Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). These notions are, of course, subjective to some extent. What may be safely said is that the amendment prohibits 'a hard core of inhuman conduct,' see 84 Harv.L.Rev. 456, 457 (1970). There is no doubt, as the majority concedes, that a prisoner is not a constitutional pariah. Were that not the case, there would be no basis for the holding that the first amendment was violated here. But the eighth amendment, no less than the first, protects Sostre.[4] Its command is both spacious and changing.
 
 
 108
 The fact that solitary confinement for an indefinite period has historically been accepted as a viable instrument of prison discipline does not prevent us from finding that it violates the eighth amendment. What might once have been acceptable does not necessarily determine what is 'cruel and unusual' today. Recently, the Eighth Circuit has held that whipping by strap is proscribed, although it had once been a familiar practice. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968). Indeed, this court emphasized only a few years ago that the eighth amendment 'is not fastened to the obsolete.' See Wright v. McMann, supra, 387 F.2d at 525, quoting Weems v. United States, 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In this Orwellian age, punishment that endangers sanity, no less than physical injury by the strap, is prohibited by the Constitution. Indeed, we have learned to our sorrow in the last few decades that true inhumanity seeks to destroy the psyche rather than merely the body. The majority opinion emphasizes that after all Sostre could have obtained release from isolation at any time by agreeing to abide by the rules and to cooperate. Perhaps that is so, but that does not change the case. That response could be made were a prisoner kept in solitary for two years instead of one, or for five years, or for ten, or more. The possibility of endless solitary confinement is still there, unless the prisoner 'gives in.' The same observation could be made if Sostre were tortured until he so agreed, but no one would argue that torture is therefore permitted. The point is that the means used to exact submission must be constitutionally acceptable, and the threat of virtually endless isolation that endangers sanity is not.
 
 
 109
 The crucial holding of the majority opinion is the refusal to put any limit upon the period of solitary confinement. It is the unusual duration and the openended nature of the isolation that the district court and the experts regarded as inflicting the worst psychological harm. Accordingly, as we did in Wright v. McMann, supra, 387 F.2d at 526, I would hold that the punishment here, 'which could only serve to destroy completely the spirit and undermine the sanity of the prisoner,' runs afoul of the eighth amendment.
 
 
 110
 The second fundamental reason why I differ with the majority opinion stems from the contrast between what it finds necessary to decide and what it refuses to decide. As indicated above, the majority states in an extended dictum that if the warden's motives had been proper, the combined effect of Sostre's alleged violations would have been 'serious' enough to justify the harsh punishment he received. Thus, the majority stresses 'the seriousness of the multiple offenses charged against Sostre' and expresses 'no view as to the constitutionality of such segregated confinement if it had been imposed on account of any one or any combination of the offenses charged against Sostre other than all of them.' But the fact is that two of the allegedly serious 'multiple offenses' were Sostre's refusal to desist from preparing legal papers for a codefendant and his possession of six tables of contents torn from issues of the Harvard Law Review. I would not hold unconstitutional the isolation of an adult prisoner for a sharply limited period as punishment for a serious breach of prison discipline, e.g., what the majority calls 'a credible threat to the security of the prison,' see p. 194, supra. But these two offenses were simply not grave enough to justify the extremely severe punishment visited upon Sostre. Accordingly, the excessiveness of the penalty for these two alleged transgressions would alone violate the eighth amendment's proscription of cruel and unusual punishment, and I would say so.
 
 
 111
 Finally, while the majority reaches out to decide that Sostre's confinement would have been constitutional under a hypothetical set of facts, it refuses to rule that his punishment was cruel and unusual even though it was actually meted out for improper reasons. It is true that the majority also leaves open the constitutionality of such 'confinement as Sostre experienced,' if imposed for 'lesser offenses.' The inconsistency of this approach is apparent since if such confinement, in the majority's view, could ever be so excessive a penalty as to be unconstitutional, it should be declared so when there was no basis for the confinement at all.
 
 
 112
 In sum, keeping Sostre in solitary for over a year was 'cruel and unusual punishment' because (1) the length and open-ended nature of his confinement threatened sanity; (2) two of the alleged offenses were so minor as to make the penalty constitutionally disproportionate; and (3) the ostensible reasons were a pretext for vindictive action. I also agree with Judge Smith's opinion with regard to defendant McGinnis. For the reasons and to the extent set forth above, I dissent.
 
 
 113
 HAYS, Circuit Judge, dissenting (with whom MOORE, Circuit Judge, concurs):
 
 
 114
 I dissent from the affirmance of any grant of injunctive relief or damages.
 
 
 115
 In deciding this case the majority have overlooked two fundamental guiding principles. The first is that although persons serving sentences in prison for crime are not to be denied all constitutional protections, there are significant differences between the constitutional rights such prisoners may assert and the constitutional rights of those who are free from prison restraints. For example, although the majority holds that Sostre is protected by the Constitution in his right orally to set forth his political opinions to his fellow prisoners, it may be that even they would balk at a claim that the Constitution gave Sostre the right, similar to the right which he would have if he were free, to assemble the inmates and harangue them with revolutionary political doctrines. As the Court of Appeals of the Fourth Circuit said in McCloskey v. Maryland, 337 F.2d 72, 74 (4th Cir. 1964), persons in prison have 'no judicially enforceable right to propagandize within the prison walls * * *.' The other fundamental principle which receives short shrift at the hands of the majority is that the federal courts should be extremely hesitant to take over the administration of state prisons. We have said that the federal courts should refuse to interfere with the internal affairs of state prisons except in the most extreme case involving "conduct that shocks the conscience" or where the acts of prison officials are "barbarous." Church v. Hegstrom, 416 F.2d 449, 450-451 (2d Cir. 1969) (citations omitted). See also Wright v. McMann, 387 F.2d 519, 527-528 (2d Cir. 1967) (Lumbard, Ch. J., concurring); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Jackson v. Bishop, 404 F.2d 571, 577 (8th Cir. 1968) (Blackmun, C.J.). Correction authorities must have wide discretion in matters of internal prison administration. Smith v. Schneckloth, 414 F.2d 680, 681 (9th Cir. 1969); Beard v. Lee, 396 F.2d 749, 751 (5th Cir. 1968); Lee v. Tahash, 352 F.2d 970, 971-972 (8th Cir. 1965); McCloskey v. Maryland, supra, 337 F.2d at 74; Sostre v. McGinnis, supra, 334 F.2d at 908. Their decisions in matters of prison discipline should not be disturbed when they are supported by evidence and do not result in shocking deprivations of fundamental human rights. See Wright v. McMann, supra.
 
 
 116
 In the present case Warden Follette testified that Sostre's punishment was based upon (1) defiance of Follette's order to desist from preparing legal papers, (2) refusal to answer proper questions,[1] (3) statements about his impending liberation, and (4) possession of several items of contraband in his cell. Sostre did not even deny the truth of the first three of these accusations and the fourth was supported by ample evidence. Nevertheless Judge Motley disregarded Follette's findings and testimony and found that Sostre was not punished for any of these infractions.
 
 
 117
 Observance of the correct legal principles would lead in this case to reversing the trial court with respect to all relief granted.
 
 
 
 *
 Judge Waterman was an active circuit judge at the time the court commenced in bano consideration of this case
 
 
 [1]
 On June 12, the district court ruled that Follette's successor as Warden (now called Superintendent) of Green Haven would be automatically substituted as defendant in this action under F.R.Civ.P. 25
 
 
 [2]
 We also agree with Judge Motley that defendants have not demonstrated the adequacy of other relevant administrative procedures. See 312 F.Supp. at 883-884 n. 14
 
 
 [3]
 Section 140 was repealed and replaced with a new Section 137, effective July 8, 1970 (McKinney Supp.1970). Section 137, subd. 6 of the new statute vests the Superintendent of each correctional facility (formerly called the Warden) with discretion to 'keep any inmate confined in a cell or room apart from the accomodations provided for inmates who are participating in programs of the facility, for such period as may be necessary for maintenance of order and discipline. * * *'
 
 
 [4]
 On July 11, 1968, Deputy Warden Sawner called Sostre before a 'disciplinary court,' conducted by Sawner alone, and charged Sostre with sending letters covertly to unauthorized correspondents under the guise of writing to his sister, Letitia. Sostre admitted the infraction, which Follette claimed to have been under investigation as early as June 25, the day he committed Sostre to segregation. For this violation, Sostre was penalized with the loss of 90 days of 'good behavior time' credit. In addition, Letitia was removed from the list of Sostre's approved correspondents
 
 
 [5]
 New York State prisoners may earn a maximum of ten days 'good behavior time' credit each month, thereby advancing both the date the prisoner will be eligible for parole and the date he is entitled as of right to be 'conditionally released' (that is, released from custody subject to parole conditions). Prison authorities may restore good behavior time withheld or revoked. See N.Y.Penal Law 70.30, subd. 4, 70.40, subd. 1 (McKinney's ConsolLaw, c. 40 1967); N.Y. Correction Law 230, 803 (McKinney 1968). The repeal of Section 230, as of July 8, 1970 (McKinney Supp.1970), does not affect allowances for good behavior permitted prior to that date. Forfeiture of the chance to earn 'good time' credit during punitive segregation is prescribed by regulation. 7 N.Y.Codes, Rules & Regulations, Correction 60.6(c)
 
 
 [6]
 See n. 11, infra
 
 
 [7]
 Several prisoners who had served time in Green Haven's punitive segregation unit testified that more punishing than the deprivation of desserts was the loss of the opportunities available to the general population to receive food packages from the outside, to borrow snacks from other prisoners, and to earn pay with which to buy extra food from the prison commissary
 
 
 [8]
 On the date Sostre was released from segregation he was punished by confinement to his cell for several days, ostensibly because 'dust' was found on his cell bars. Although Judge Motley found that this punishment represented 'retaliation for his legal success,' no relief was predicated on this finding and hence the incident need not concern us further
 
 
 [9]
 A panel of this court on July 10, 1970, expedited the appeal and granted a further stay of subparagraph 2 to the extent that it was limited to placing Sostre in punitive segregation for more than three days at any one time or a total of more than ten days, pending the hearing of this appeal
 
 
 [10]
 All Commissioner McGinnis knew or should have known of the reasons for Sostre's confinement was communicated to him by Follette, see 312 F.Supp. at 882, who of course did not relay Sostre's version of the June 25, 1968 interview
 
 
 [11]
 Dr. William C. Johnston, a psychiatrist and Director of Mattawan State Hospital for the cirminally insane, with extensive experience in dealing with mentally disturbed prisoners, rejected Dr. Halleck's assessment. Dr. Johnston reported that he had in fact supervised a successful compusory group counseling program while Director of Dannemora State Hospital. Dr. Johnston also did not agree with plaintiff's experts that segregated confinement would likely endanger prisoners' sanity
 
 
 [12]
 Hearings on H.R. 6964, H.Subcomm. No. 3. Comm. on the Judiciary, 89th Cong., 1st Sess., at 2 (May 20, 1965) (testimony of Nicholas deB.Katzenbach)
 
 
 [13]
 See U.S. Bureau of Prisons, The Residential Center: Corrections in the Community (1970)
 
 
 [14]
 See e.g., Garabedian, Challenges for Contemporary Corrections, 33 F.ed.prob. No. 1, at 3 (Mar. 1969); Rachin, The Message Corrections Must Get Across, 34 Fed.Prob. No. 2, at 3 (June 1970); Summary of The Report of the President's Task Force on Prisoner Rehabilitation (1970), 34 Fed.Prob. No. 3, at 3 (Sept. 1970). We do not ignore New York's active participation in this reform movement. See N.Y.Correction Law Art. 26 (McKinney Supp.1970) (work release program)
 
 
 [15]
 'Traditional prisons, jails, and juvenile institutions are highly impersonal and authoritarian. Mass handling, countless ways of humiliating the inmate in order to make him subservient to rules and orders, special rules of behavior designed to maintain social distance between keepers and inmates, frisking of inmates, regimented movement to work, eat, and play, drab prison clothing, and similar aspects of daily life-- all tend to depersonalize the inmate and reinforce his belief that authority is to be opposed, not co-operated with * * * Such an attitude is, of course, antithetical to successful reintegration.' President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 11 (1967) (hereinafter cited as 'Corrections')
 
 
 [16]
 Chief Justice Burger, a persistent critic of our system of criminal justice which places every protection around an accused but seems to abandon him when he is sentenced to prison, recently observed that 'a man in a cage needs incentive, motivation, and something to look forward to.' U.S. News and World Report 32 (Dec. 14, 1970)
 
 
 [17]
 Cf. Burns v. Swenson, 430 F.2d 771 (8th Cir. Aug. 31, 1970) ('base, inhuman, and barbaric'); Hancock v. Avery, 301 F.Supp. 786, 791-792 (M.D.Tenn.1969) ('barbaric,' 'debasing,' 'violates basic standards of human decency'); Holt v. Sarver, 309 F.Supp. 362, 380 (E.D.Ark.1970) ('grossly excessive,' 'shocking or disgusting'); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966) ('shocking and debased' conditions justify court's intervention to 'restore the primal rule of a civilized community')
 
 
 [18]
 Indeed, the first prisons in this country, widely imitated in Europe, were intended 'to serve as place(s) for reflection in solitude leading to repentance and redemption.' The Eastern State Penitentiary in Pennsylvania (1829). Where inmates lived, worked, and exercised without being permitted to talk with fellow prisoners 'was copied abroad perhaps more than any other American invention.' Corrections 3. See American Correctional Ass'n, Manual of Correctional Standards 13 (3d ed. 1966) (hereinafter cited as 'Manual'). All forms of prison punishment in this country pale by comparison with those endured by Henri Charriere in the dungeons and French Penal Colony described in his book papillon (Morrow 1970)
 
 
 [19]
 See Tenn.Code Ann. 41-707 (maximum 30 days solitary for each offense); Corrections 210 (disciplinary confinement maximum 30 days); American Correctional Ass'n, Manual 418 (punitive segregation maximum 30 days); American Law Institute, Model Penal Code 304.7 (3) (Proposed Official Draft 1962) (disciplinary confinement maximum 30 days). However, comparisons and extrapolations are hazardous where factual contexts are lacking. For example, The Amercian Correctional Association, Manual 419, would apparently not proscribe indefinite confinement to 'administrative segregation.' The practical distinction intended between 'punitive' any 'administrative' segregation may or may not parallel that at Green Haven Prison between 'punitive' and 'protective' segregation
 
 
 [20]
 Mo.Rev.Stat. 216.405, cited in Burns v. Swenson, 430 F.2d 771 (8th Cir. Aug. 31, 1970); statutes cited Amercian Law Institute, Model Penal Code 305.7.6 n. 13 (Tent.Draft No. 12, 1960)
 
 
 [21]
 Bureau of Prisons, Policy Statement: Inmate Discipline, No. 7400.5A, P3.c, App. B P1.d(8) (July 2, 1970)
 
 
 [22]
 The Supreme Court has struck down a choice of punishments only when the penalty was authorized in almost no other civilized jurisdiction, Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or conflicted with moral precepts 'universally held,' Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). See also Jackson v. Bishop, 404 F.2d 571, 580 (8 Cir. 1968) (use of strap permitted in only two states, outlawed in several)
 
 
 [23]
 Judge Feinberg expresses the view in his dissent, that 'isolation of an adult prisoner for a sharply limited period as punishment for a serious breach of prison discipline' would be constitutional. But then he goes on to ask rhetorically whether solitary or segregated confinement 'for two years instead of one, or for five years, or for ten, or more,' would be constitutional. We have made an effort to suggest the impracticality of setting any specific time period for segregated confinement, beyond which the punishment would be 'cruel and unusual.' In some instances, depending upon the conditions of the segregation, and the mental and physical health of the inmate, five days or even one day might prove to be constitutionally intolerable. We would ask our dissenting brother in turn, would nine months, six months, or three months of segregated confinement be unconstitutional, without reference to the circumstances of confinement?
 Judge Feinberg is also properly concerned with 'endless solitary confinement * * * unless the prisoner 'gives in." Our response is that we are concerned also. But one must ask on what was it that Sostre was expected to 'give in.' He was asked to show a change in his intransigent defiance of several prison regulations, defiance which posed a credible threat to the security of the prison, by attending group therapy sessions. Does it violate principles of fundamental decency to insist that a prisoner comply with reasonable rules applicable to all similarly situated?
 
 
 [24]
 In response to Judge Feinberg's dissent, we emphasize that no one testified that based on his observation or as the result of a physical or psychological examination of Sostre, he concluded that Sostre was being adversely affected or that his physical or mental health was threatened. We note that the record shows that a prison physician visited Sostre's segregation unit daily, and at no time did the physician observe, or did Sostre call to his attention, any such effects
 Indeed, the experts before the district court were in conflict even over the hypothetical question whether the conditions that Sostre experienced in segregation would be dangerous to the sanity of 'a prisoner.' See p. 190 and fn. 11, supra. On the basis of these conflicting expert opinions, Judge Feinberg observes that the district court found as a fact that these conditions 'could only serve to * * * undermine the sanity of the prisoner' * * * when imposed for more than fifteen days. we do not agree with our brother that we are required to declare this 'finding' to be either right or wrong, either 'clearly erroneous' or adequately supported by the record and therefore correct. We are not concerned here with conflicting testimony of witnesses to the same unique historical event. The question, rather, is a general one; whether the Eighth Amendment absolutely forbids a state to use a means of discipline when there is no evidence of any physical or psychological injury to the health of the prisoner who complains of the measure, and also when the opinions of the experts as to the effects of the type of discipline are in conflict. To hold the district court either right or wrong would be tantamount to ruling that either Dr. Halleck or Dr. Johnston is right, and the other is wrong. That is not our function, nor was it the function of the district court. It is a judgment among competing, rational policies, a judgment therefore properly reserved for decision by state political and administrative processes. See e.g., Ginsberg v. New York, 390 U.S. 629, 642-643, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
 
 
 [25]
 This element distinguishes the instant case from Krist v. Smith, 309 F.Supp. 497, 501 (S.D.Ga.1970), where the court found no constitutionally acceptable justification for denying segregated prisoners a chance to exercise
 
 
 [26]
 In view of the widely recognized and critical shortage of specialists such as psychologists in prison systems generally, it would defy reality to discount the value of the group therapy program because of the somewhat limited training and experience of the leader. Corrections 205. As noted above, p. 190 and fn. 11 supra, the expert testimony at trial below conflicted as to the impact on the effectiveness of group sessions of coercing prisoners' participation
 
 
 [27]
 E.g., Wright v. McMann, 387 F.2d 519, 521 (2d Cir. 1967) (complaint alleged cell encrusted with excrement; plaintiff entirely naked 11 days, then clad only in thin underwear; windows open throughout subfreezing night; prisoner slept on concrete floor; no soap, towel, or toilet paper); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969) (virtually no light or ventilation; hole for wastes flushed irregularly by guards; no soap, towel, or toilet paper; two meals of bread, one full meal); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Calif.1966) (conditions similar to Hancock and in addition prisoner slept naked on concrete floor)
 Sostre does not allege that he was arbitrarily or discriminatorily punished or abused by prison authorities while he was segregated. See Fulwood v. Clemmer, 206 F.Supp. 370 (D.C.D.C.1962) (plaintiff, among other things, unlawfully denied exercise of his religion while segregated and improperly transferred from prison to a jail because of his religion); Holt v. Sarver, 309 F.Supp. 362, 380 (E.D.Ark.1970) (prisoners subjected to arbitrary power of other prisoners). Cf. Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968) (impossible for prison authorities or courts to supervise administration of corporal punishment so as to prevent excesses).
 
 
 [28]
 We stress the seriousness of the multiple offenses charged against Sostre by Warden Follette, see pp. 183-185, supra, and express no view as to the constitutionality of such segregated confinement as Sostre experienced if it were imposed for lesser offenses. Specifically, we express no view as to the constitutionality of such segregated confinement if it had been imposed on account of any one or any combination of the offenses charged against Sostre other than all of them
 
 
 [29]
 Judge Foley of the Northern District of New York has adopted the procedural aspect ofJudge Motley's order. Wright v. McMann. 257 F.Supp. 739 (July 31, 1970), on rehearing after remand, 387 F.2d 519 (2d Cir. 1967). In Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y. Sept. 8, 1970), Judge Mansfield approved aspects of these procedures, remarking that 'any serious charge' would require such 'essential elements of fundamental procedural fairness' as 'an opportunity to present evidence before a relatively objective tribunal.'
 
 
 [30]
 In Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), the Court had held that an unrepresented defendant was unfairly prejudiced by the sentencing court's reliance on 'assumptions concerning his criminal record which were materially untrue.'
 
 
 [31]
 See Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398. 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Slochower v. Bd. of Educ., 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). See generally, Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968)
 
 
 [32]
 Cf. Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944) (prisoner entitled to writ of habeas corpus if deprived of right which makes imprisonment more burdensome than law allows)
 
 
 [33]
 See Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 193, 197 (1969)
 
 
 [34]
 Followed in Lewis v. Rockefeller, 431 F.2d 368 (Sept. 1, 1970). Cf. United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2d Cir. 1970)
 
 
 [35]
 For similar reasons the Court in Williams v. New York, 337 U.S. 241, 69 C.Ct. 1079, 93 L.Ed. 1337 (1949), found no denial of due process when the appellant was sentenced on the basis of 'information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination.'
 
 
 [36]
 Plaintiff was not systematically denied safeguards afforded non-prisoners prior to a transfer to a different state institution. See Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); Shone v. Maine, 406 F.2d 844 (1st Cir. 1969); Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968); United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1966). His reliance on those cases is misplaced
 
 
 [37]
 See American Law Institute, Model Penal Code 304.7(2) (Proposed Official Draft 1962) (before inflicting punishment, warden to be advised by disciplinary committee after 'hearing' where prisoner would appear after receiving notice of charges); American Correctional Ass'n, Manual 409 (expeditious hearing, adequate investigation, regular channel for appeal, written report of the infraction found and disposition)
 
 
 [38]
 Accord, Burns v. Swenson, 430 F.2d 771 (8th Cir. August 31, 1970). Plaintiff, an inmate of the Missouri State Penitentiary, was summarily committed, without a prior hearing, to segregated confinement that was to last more than three years. An investigative report was not filed until more than a month after Burns's confinement. At review hearings held six months after he was committed, and again shortly before his release, Burns appeared but did not confront adverse witnesses, was not assisted, and apparently was not permitted to present evidence. The court found no due process violation
 
 
 [39]
 'A first tenet of our governmental, religious, and ethical tradition is the intrinsic worth of every individual, no mater how degenerate. It is a radical departure from that tradition to subject a defined class of persons, even criminals, to a regime in which their right to liberty is determined by officials wholly unaccountable in the exercise of their power. * * *' Corrections 83. See Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795, 834 (1969) (discipline should be based on 'proven facts' and should be 'rationally related to the objective sought')
 
 
 [40]
 The Court in Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935) (Cardozo, J.), interpreting the federal probation law, adopted a similarly flexible solution: 'Clearly the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation. * * * This does not mean that he may insist upon a trial in any strict or formal sense. * * * It does mean that there shall be an inquiry so fitted in its range to the needs of the occasion as to justify the conclusion that discretion has not been abused by the failure of the inquisitor to carry the probe deeper.'
 
 
 [41]
 On appeal, the order of the district court dismissing the complaint in Nolan was reversed with instructions to take evidence to determine whether any 'assurances of elemental fairness' had in fact been afforded in the disciplinary action that was the object of plaintiff's suit. 430 F.2d 548 (Aug. 14, 1970)
 
 
 [42]
 Defendants have appended to their brief on appeal new rules and regulations recently promulgated by the New York Department of Correction and effective October 19, 1970, governing, among other things, prisoner discipline in all state correctional institutions which appear to provide some new procedural safeguards. We consider it inappropriate to comment on the constitutional adequacy of the new procedures for they were adopted after the events before us on this appeal
 
 
 [43]
 Singer, Censorship of Prisoners' Mail and the Constitution, 56 A.B.A.J. 1051 (1970)
 
 
 [44]
 'Restrictions on the extent and character of prisoners' correspondence and examination or censorship in relation thereto have always been regarded as inherent incidents in the conduct of penal institutions and the control of confinements, activities, preoccupations and other relationships therein.' Lee v. Tahash, 352 F.2d 970, 971 (8th Cir. 1965)
 
 
 [45]
 Nor does Johnson sanction inter-prison legal aid among prisoners. Some slight incremental value might be discerned were the right of access to courts extended so as to embrace a right to the aid of jailhouse lawyers wherever they might be incarcerated. Any gain, however, would be outweighed by the consequential added interference with prison discipline and the danger that more aggressive prisoners would abuse their expanded power. A co-defendant stands in no better position than any other jailhouse lawyer in this respect
 
 
 [46]
 Thus, legal material might be acquired either from the prison library, through the prisoner's own outside sources, or even from Sostre himself, with prior approval of prison officials
 
 
 [47]
 The authoritarian 'boss' inmate is no chimera. See Corrections 46. The Court in Johnson v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), recognized that prison writ writers might occasionally menace prison discipline. See also Hatfield v. Bailleaux, 290 F.2d 632, 639 (9th Cir.), cert. denied, 368 U.S. 862 (1961) (testimony of prison officials that rules restricting access to law books were designed to forestall aggressive inmates from dominating weaker ones)
 
 
 [48]
 A case of suppression would, however, require us to decide the relevance of such doctrines as the 'clear and present danger test' that courts have relied upon in other contexts to decide the validity of restraints operating directly upon the content of speech. See Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Long v. Parker, 390 F.2d 816, 822 (3rd Cir. 1968) ('to justify the prohibition of religious literature, the prison officials must prove that the literature creates a clear and present danger of * * * some * * * substantial interference with the orderly functioning of the institution'); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1966); Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964)
 
 
 [49]
 See note 42, supra
 
 
 [50]
 In granting this relief to Sostre, we do not resolve the question whether a claim for relief grounded solely on the contention that good time credit was unconstitutionally withheld or forfeited would, standing alone, support an action under 42 U.S.C. 1983, without compliance with the exhaustion requirement of 28 U.S.C. 2254(b), (c). See p. 182, supra
 
 
 [51]
 As state administrative officials, defendants are not entitled to the protective immunity from a judgment for damages that has been extended to judges, Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and legislators (Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (7951)). Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966)
 
 
 [52]
 Judge Motley awarded $25.00 compensatory damages per day for every day that Sostre spent in segregation (372 days) or a total of $9,300. In view of the conditions of Sostre's segregation, which we have described, this amount is not unreasonable. In addition, she awarded $3,270 in punitive damages
 
 
 [53]
 We do not now decide the question, not passed on below and neither briefed nor argued orally on this appeal, whether plaintiff may yet recover damages against a party not before us
 
 
 [1]
 See, e.g., 42 U.S.C. 1983
 
 
 [2]
 It may be that despite this disclaimer in the majority opinion we have in fact decided that minimum standards are not met if the prisoner is not at least confronted with an accusation, informed of the evidence against him, and is afforded a reasonable opportunity to explain his actions. See pp. 196, 198, 203, supra. However, it does seem clear that decision as to what are wholly acceptable minimum standards is left for another day through case-by-case development
 
 
 [1]
 See, e.g., 'We cannot agree (that the conditions Sostre endured) require that similar punishments be limited in the future to any particular length of time,' p. 191, supra; 'The Eighth Amendment (does not forbid) indefinite confinement under the conditions endured by Sostre for all the reasons asserted by Warden Follette until such time as the prisoner agrees to abide by prison rules,' p. 193, supra
 
 
 [2]
 'He was not as isolated in his segregation as 'solitary' would imply,' see p. 183, supra
 
 
 [3]
 See p. 185, supra
 
 
 [4]
 Through the due process clause of the fourteenth amendment. See Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1961)
 
 
 [1]
 In order to maintain discipline prison inmates may be required to answer questions fully and completely. See United States ex rel. Sperling v. Fitzgerald, 426 F.2d 1161, 1165 (2d Cir. 1970) (Lumbard, Ch. J., concurring)