**Earl SIMMONS et al.**

**v.**

**Harry E. RUSSELL, Supt., and N. A. Williams, Deputy Supt., State Correctional Institution, Huntingdon, Pennsylvania.**

**Carl BAILEY**

**v.**

**Harry E. RUSSELL, Supt., and N. A. Williams, Deputy Supt., State Correctional Institution, Huntingdon, Pennsylvania.**

**Maurice A. BROWN**

**v.**

**Harry E. RUSSELL, Supt., et al.**

**Civ. Nos. 69–512, 69–508, 69–511 and 70–52.**

United States District Court,
M. D. Pennsylvania.
Nov. 20, 1972.

J. Thomas Menaker, Harrisburg, Pa., for plaintiffs.

Curtis M. Pontz, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, District Judge.

These consolidated Civil Rights cases, asserted under 42 U.S.C. § 1983,[1] all

---

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitu-

arise from a series of incidents occurring at the Pennsylvania State Correctional Institution at Huntingdon, Pennsylvania, commencing on October 4, 1969, as a result of which certain inmates seek injunctive relief and damages. Defendants are the Superintendent, Deputy Superintendent, a Sergeant of the Guards and other unidentified prison personnel. The cases were originally assigned to the late Judge Frederick Follmer and, subsequent to his death on May 3, 1971, were reassigned to the writer of this memorandum. After certain motions were disposed of, the matter was set down for non-jury trial on July 17, 1972, at which time evidence was received. At the request of counsel for all parties, the hearing was continued until September 11th and 12th, 1972,[2] in order to allow more time for discovery and trial preparation. Additional evidence was received at the adjourned hearings and the following facts emerge:

The normal inmate population at Huntingdon varies between 700 and 800 prisoners. On September 4, 1969, prison officials became aware of rumors concerning a possible demonstration and riot. During the last week of September, there was an attempt to set fire to the Sticker Plant (the gummed stickers affixed to automobile license plates are produced here) where prison officials discovered and extinguished a rag which had been saturated with an oily substance, ignited and thrown in the plant window. At about the same time, the guards discovered a grappling hook, made in the prison metal shop, which had been concealed under a mound of dirt in the Athletic Field.

On Saturday, October 4, 1969, at approximately 2:00 P.M., a group of inmates (estimates varied between 50 and 150) converged on the control center of the penitentiary demanding that they be allowed to visit the Hospital Infirmary to investigate rumors that an inmate, Ronald Hill, had been severely beaten by guards. A discussion followed, sometimes heated,[3] and it was initially agreed that a committee of two inmates would be allowed to go to the Hospital but this was later recanted by prison officials and the inmates were ordered to return to B yard (a recreational area and field approximately 75 yards in width and 100 yards in length). The inmates decided to stage a sit-down strike and, after the recreational period had ended, 89 inmates remained in B yard, refused to return to quarters and informed Prison officials that they wanted to discuss grievances with the Superintendent, Harry E. Russell. The Superintendent refused to talk to them and Deputy Superintendent Norris A. Williams gave the orders whereupon guards in riot gear moved these inmates, without incident, into B block segregation. All segregated cells at Huntingdon are located in B block which is divided into two sections: (1) *punitive segregation*, a large three-tiered block consisting of 117 cells, and (2) *seclusion*, a smaller enclosed area to the rear of punitive segregation consisting of a small three-tiered block of 14 cells plus 3 separate cells enclosed in translucent masonry glass and known as the "glass cage". The routine procedure in punitive segregation was to require all prisoners to remove their clothing and to issue them special segregation apparel consisting of a T-shirt, pair of shorts, striped coverall trousers and canvas slippers. Those in seclusion received one-piece coveralls and canvas slippers. Because of the large number of men brought into B block punitive segregation at the same time, there was a limited supply of some clothing and

tion and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. Neither plaintiff Bailey nor plaintiff Brown appeared at any of the hearings, although notice was properly provided. Lomax filed a motion for a voluntary dismissal which was granted on September 15, 1972.

3. Brooks testified that plaintiff Brown "became emotional" after being told, "If you don't like it, lock up", which means, according to prisoner witnesses, returning to his cell.

inmates Charles Negri, Thomas R. J. Moore and Earl Simmons were naked when put in their cells but all received clothing shortly thereafter. In addition, mattresses and blankets were distributed to all segregated inmates.

The following day, Sunday, October 5, 1969, some time after 1:00 P.M., another group of inmates congregated in B yard and refused to disperse until prison authorities released those confined in B block segregation and allowed them to see the men in the Hospital Infirmary. Prison officials refused these requests and 15 inmates were marched into B block seclusion where they were ordered to strip and were issued special clothing. Plaintiff Harold Brooks was placed in the "glass cage", also identified as a "quiet cell". Brooks testified further that he remained naked for 14 days, without a blanket, and that cold air from a fan was blown on him as punishment but this account was not supported by other plaintiff witnesses, particularly Negri and Moore who were also placed in the glass cage and, consequently, is rejected.

The next morning, Monday, October 6, 1969, prison officials were tense and apprehensive concerning the possible reaction of the general prison population to the mass segregation of 104 inmates. At bugle call reveille, bedlam broke out in B block segregation as segregated inmates began banging beds, kicking on doors, and shouting to the general population to demonstrate in sympathy. This outbreak had the appearance of being prearranged and the noise and importuning could be heard in the prison dining room during breakfast. Prison officials felt the situation was strained and potentially explosive, and arrangements were made to remove the ringleaders of the outburst, who were identified by officers on duty, into seclusion. Lieutenant Emmanuel Wicker was placed in charge of a contingent of guards, who were directed to move these inmates from B block punitive segregation into seclusion. Plaintiffs Negri and Moore were moved into seclusion and placed in the "glass cage" without difficulty. While the guards were leading plaintiff Maurice Brown down the corridor of the first tier block, he turned suddenly, shouting obscenities, assumed a karate stance and began lashing out at the guards with his hands and feet. He then lunged at Officer Paul Rowe and grabbed him around the neck. The two scuffled and Officer Neil Lane struck Brown on the head with his baton (nightstick) and squirted him with mace in an effort to get him to release his grip. Brown was physically transported to seclusion where within 15 minutes, a Hospital Supervisor sutured Brown's scalp. When the contingent of guards entered plaintiff Earl Simmons' cell prior to his removal, they decided, after the Brown incident, to "take a hold" of him and attempted to place a claw (one handcuff attached by chain to a T-iron) on his wrist when he broke away, ran down the corridor, climbed the screen which separated the tiers and was apprehended on the top tier and taken to seclusion. Inmate Nathan Thomas, one of those placed in punitive segregation on October 5th, was also removed to seclusion by Lt. Wicker's crew after he created a disturbance by throwing a pancake from his breakfast tray at Officer Rowe. Misconduct reports were filed against all prisoners who participated in the October 4th and 5th demonstrations. With the exception of isolated instances of certain inmates throwing water, food, and human waste at guards in B block, there were no further eruptions or flare-ups.

Prior to October 4, 1969, the following practices existed in segregation at Huntingdon:

(a) In punitive segregation, a mattress, sheet and blanket were issued while those in seclusion received a mattress and two blankets. The mattress and bedding were removed each morning, placed in storage cells, and returned at night. This practice has been changed and today nothing is removed from the cell during the day and all receive sheets and pillowcases.

(b) In punitive segregation, soap and hand towels were issued, but removed after use, and toothpaste and toothbrush were given to each inmate; while the inmates in seclusion received toothpaste and a toothbrush, and toilet tissue was furnished on request, but no soap was provided in the cells. All segregated inmates were normally allowed to shower daily, to be shaved weekly by an inmate barber, and given a clothing change twice a week. Today every man is permitted to keep two hand towels, soap, toothbrush, and toilet tissue in his cell but razors, shaving cream, brushes, and mirrors are removed after being used.

(c) Inmates were served the same menu, although in smaller amounts, as those not in segregation except for dessert but today they receive full rations including dessert.

(d) One hour per day exercises were provided in the yard or in the block, but occasionally were limited because of security problems and the size of the yard to 10–12 at a time and, when there was a large number of inmates in segregation, adjustments had to be made. Presumably the same policy exists today.

(e) An institutional rule forbade any inmate from possessing legal documents of another inmate in his cell. This rule is not in effect today.

(f) In punitive segregation, inmates were allowed to receive all incoming mail and legal material but were allowed to mail only one letter a week. No correspondence, in or out, was permitted in seclusion except where the prisoner had to meet a deadline set by the Court. Today there is no limitation on access to legal materials or correspondence except for direct violation of mail privileges and an Inmate Legal Aid Clinic has been established.

(g) Visiting privileges in punitive segregation were denied for a maximum of sixty days and, in seclusion, only visits by counsel of record were allowed. This policy has similarly been abandoned and full visiting privileges are now afforded except where a security problem is involved.

Notwithstanding the policy existing on October 4, 1969, concerning bedding, clothing, toilet articles, exercise periods, etc., plaintiffs' claim that they were given an inadequate supply of clothing; were denied soap, towels, toothbrush, and a sufficient supply of toilet paper; were not allowed to shower for at least a week; were given food that had been contaminated with hair, sputum and ashes; and were subjected to physical abuse, all of which constituted cruel and unusual punishment in violation of their Eighth Amendment rights. In addition, plaintiffs contend that prison restrictions on availability of legal materials, access to the courts, correspondence privileges, and resort to legal assistance, together with the delay in affording notice and a hearing on misconduct charges, violated their rights under the First, Fifth, Sixth and Fourteenth Amendments. Defendants concede that there were certain temporary shortages of supplies, exercising opportunities and shower privileges,[4] but that this was caused by the emergency situation in which 104 inmates had to be confined in punitive segregation, thereby fully taxing these facilities. They specifically denied all charges of physical abuse and food tampering, asserting further that the meals served, though somewhat less than that provided in general population, where adequate under the circumstances. Any delay in hearings, according to defendants, was necessitated by the fact that more than one hundred hearings had to be held and, while they were promptly commenced on October 7th, delay was inevitable because each hearing consumed twenty to thirty minutes.[5] Finally, defendants argue that

---

4. There were only two shower heads in segregation and there was no time limitation on an inmate while showering.

5. The Disciplinary Board consisted of the Deputy Superintendent, Director of Treatment, Prison Psychologist, Captain

the limitations on correspondence, legal assistance, and access to the Courts have now been eliminated and plaintiffs have not produced any competent proof that they were legally damaged while these rules were in existence.

Upon considering all the evidence, I conclude that (a) the physical force applied to plaintiffs Brown and Simmons was warranted under the circumstances; (b) there is no credible evidence of food adulteration; (c) the food rations in punitive segregation were adequate; and (d) the conditions of solitary confinement relating to personal hygiene, exercise periods and cell facilities, though severe, were partially the result of the emergency then prevailing and, in any event, were not so foul, inhuman and barbaric as to constitute cruel and unusual punishment.

 It is well established that solitary confinement in and of itself does not violate Eighth Amendment prohibitions and the temporary inconvenience and discomforts incident thereto cannot be regarded as a basis for judicial relief. Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir. 1969). It is only when solitary confinement becomes "so foul, so inhuman, and so violative of [the] basic concepts of decency", Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), that a federal court should interfere with prison officials who purportedly have the experience and expertise in matters of prison discipline. And this is so even though the policy may seem unsound or personally repugnant to the judiciary. Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971). While the wisdom of a policy rigidly limiting the amount of personal supplies, the use of exercise and sanitation facilities, and general inmate activity may be seriously questioned, it forms no basis for a Civil Rights action if it survives constitutional scrutiny.

The following issues remain: (1) the delay in informing plaintiffs of the charges against them for periods ranging from 16 to 25 days and the failure to allow them to confront their accusers, cross-examine adverse witnesses, present witnesses in their own behalf, and be represented by legal or other counsel; and (2) the denial of access to the courts and of legal assistance.

I. *Denial of procedural due process by the delay in informing plaintiffs of the charges against them and in the inadequacy of the hearing procedure*

It must be remembered that the chain of events leading to these lawsuits was prisoner actuated when they marched into the penitentiary control center, demanded to see a prisoner confined in the infirmary, staged a mass protest when rebuffed, and refused to obey orders to disperse and return to quarters. Certainly the action of prison officials in moving all defiant inmates into segregation was more than justified. The inflammatory conduct of those in punitive segregation in attemping to arouse the entire prison population into acts of demonstration created a tense and volatile situation requiring immediate and firm moves by prison authorities. Upon receiving information concerning the identity of those who were responsible for the outbreak (which presumably included plaintiffs), they were removed from punitive segregation into seclusion. It would appear further that hearings commenced promptly with those in punitive segregation being accommodated first (again presumably because there was question as to the extent of their involvement) and some were released from segregation immediately while the majority were released during the first week. The alleged "ringleaders" in seclusion were the last to receive hearings. Brooks requested a hearing and one was

---

of the Watch, Major of the Guards and, at times, the Vocational Advisor. The hearings continued into November but a majority of the inmates were released

the first week. It was decided to transfer the serious offenders and they remained in segregation until transferred.

held October 28th, while a hearing for Johnson was held October 20th; for Negri October 23rd; and for Simmons and Brown on October 29th. (Thomas testified that his hearing was held during the first week of November and Moore claimed that he never received a hearing but was transferred to another institution prior to Christmas.) At the hearing the charges were read to the accused inmate and he was asked how he wished to plead. If the plea was not guilty, an informal colloquy occurred between the Board and the prisoner principally concerning the report of the inmate's misconduct, as well as his complaints, and any defense he may wish to present. After the discussion was terminated, the prisoner was told to remain outside the hearing room and in a few minutes was recalled and informed of the decision. There is no showing in the record that plaintiffs requested the presence of counsel or asked to call or cross-examine witnesses. In all plaintiffs' cases, they were found guilty, committed to seclusion until further review and recommended for transfer. Simmons was transferred to the Western Pennsylvania Penitentiary on November 1st; Moore was transferred to the same institution prior to Christmas; Brooks was transferred to another State Institution (the exact location is not identified in the record) on January 14, 1970; Johnson was moved to the State Correctional Institution at Graterford in February, 1970, and Negri was similarly transferred on April 3, 1970. Thomas was moved to Graterford in December for a Philadelphia County Court hearing and remained there for a month and a half, being then returned to Huntingdon where he remained in punitive segregation.

■■ While all Courts recognize that a prisoner retains his right to procedural due process in connection with the imposition of additional punishment for a breach of prison discipline, the question remains, "What process is due?" In Sostre v. McGinnis, *supra*, the Court stated that for an inquiry to be minimally fair and rational, the prisoner should be confronted with the accusation, informed of the evidence against him, and afforded a reasonable opportunity to explain his actions. There is no showing that such protection was not afforded here. It may well be advisable for prison officials to provide additional procedural safeguards, consistent with prison security, in order to properly ascertain the truth of the charges made and avoid an accusation of arbitrary and capricious conduct, but, under the circumstances of this case as revealed by the evidence, I am satisfied that no constitutional deprivation was visited on these plaintiffs. The delay in notifying prisoners of the charges against them may be constitutionally objectionable in another context but mindful of the emergency then existing,[6] the large number of cases to be considered, the fact that less serious offenders were tried first, and that these plaintiffs in staging their protest acted deliberately and with design, thereby vesting themselves with knowledge of the basis for the charges against them, the delay did not reach constitutional proportions.

## II. *The denial of access to the Courts and of legal assistance*

■ Reasonable access to the courts is a constitutional imperative which has been held to prevail against a variety of state interests. Similarly, the right under the equal protection clause of the indigent and uneducated prisoner to the tools necessary to receive adequate hearing in the courts has received special re-enforcement by the federal courts in recent decades. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Gilmore v. Lynch, 319 F.Supp. 105 (N.D. Cal.1970), affirmed sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). The policy in ef-

6. In Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972), our Court of Appeals noted that in unusual circumstances, such as a prison riot, notice and hearing must be delayed a reasonable period of time.

fect in seclusion at Huntingdon restricting Court correspondence to cases with a prescribed deadline was clearly unreasonable and completely impeded inmates from either obtaining legal advice [7] or access to the Courts. The practices in punitive segregation of only allowing one letter per week to be mailed out similarly was unreasonable and constitutionally unsupportable. *See* Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). Fortunately, these restrictions have been eliminated and unlimited access to legal materials and correspondence is now allowed in punitive segregation while seclusion is no longer being used for punitive purposes and has been converted into a Psychiatric Unit. The defense attempts to excuse these practices as necessitated by the emergency has a hollow ring. The existing policy in seclusion forbade any mailing, absent a deadline, and was in effect even during non-emergency situations. Notwithstanding this, the emergency-created conditions were not of such gravity and import as to justify the restriction enforced here. Furthermore, there is evidence that these practices were in violation of a Department of Justice Administrative Directive and this causes me great concern, for if prison officials merely pay lip service to such directives, then the entire prison system may be undermined. It would behoove Justice Department officials to see to it that prison staffs comply with the law and administrative directives and, it goes without saying, that prison officials who set themselves up as beyond the reach of higher authority are skating on thin ice indeed. In any event, during the period from October 4, 1969, to at least February 18, 1970, plaintiffs were denied reasonable access to the Courts, to counsel, and to their legal materials.

Injunctive relief is inappropriate because the restrictions have been removed and free access is now a reality. Furthermore, the court is satisfied that there will be no recurrence of the prior practices herein criticized and disapproved. With reference to liability, except for defendants Russell and Williams, there is no contention that any other prison personnel were either responsible for, or engaged in, the implementation of this policy. Defendant Russell, as Superintendent, bears the ultimate administrative responsibility for the policy limiting access to counsel and the courts. There has been no defense evidence negating or contradicting this conclusion. Defendant Williams, as Deputy Superintendent, was actively engaged in administering this policy and the evidence revealed that his personal approval was required before an inmate in seclusion could comply with a court-ordered deadline. The evidence disclosed further that an Administrative Directive was forwarded by the Attorney General's office to Huntingdon on May 1, 1969, in which it was stated that all inmates were to be allowed to transmit and receive mail of a legal nature or concerning his legal status. As hereinbefore noted, the explanation that the limitations imposed on such correspondence was necessitated by the emergency condition will not suffice. Therefore, I find that defendants Russell and Williams are legally responsible under the Civil Rights Act for depriving plaintiffs Simmons, Johnson, and Brooks of their constitutional right of reasonable access to the courts. See Basista v. Weir, 340 F.2d 74 (3d Cir. 1965).

---

7. While prisoners are entitled to legal assistance from fellow inmates where the State has not provided a reasonable alternative, the demand here that plaintiffs, while in segregation, were entitled to confer and obtain legal assistance from Brother Moore, who was also in segregation, is untenable. An inmate, by his misconduct, may forfeit his role as a "jailhouse lawyer". This issue is not dispositive here, however, as plaintiffs were denied all legal assistance.

Plaintiffs contend that they were damaged because they were unable to pursue legal actions pending in various courts at the time they were placed in seclusion but a review of the evidence convinces me that no actual damages were sustained. For example, Johnson was able to file a nunc pro tunc pleading after being released from seclusion and the relief he sought was denied on the merits; Simmons, in his habeas corpus action, was subsequently permitted by the sentencing court to file all legal documents which he claimed were illegally confiscated while he was in seclusion; and Brooks had never filed a habeas corpus petition until after he was released from seclusion even though the opportunity was available to him from the time he arrived in Huntingdon during the summer of 1968. Plaintiffs have not sought damages because of their inability to file court actions relative to the legality of their confinements in seclusion but, even if they had, the record amply justifies such confinements and, hence, no damages would appear.[8] Finally, the actions of defendants Russell and Williams were not of such a nature as to warrant an award of punitive damages. See Basista v. Weir, *supra*; Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), affirmed 435 F.2d 1255 (3d Cir. 1970).

As only an award of nominal damages would be appropriate under the circumstances of this case, judgment will be entered in favor of plaintiffs Simmons, Johnson and Brooks and against defendants Russell and Williams in the nominal amount of one (1) dollar. As to Bailey and Brown, they not having appeared or presented testimony in support of their individual claims, judgment will be entered against them and in favor of the defendants.

---

8. The lawsuits involved here were filed by Brother Moore commencing on December 5, 1969, after he was transferred to Pittsburgh.